589 F.2d 117
 Rudolph DRAYTON, Petitioner-Appellant,
v.
Hon. John F. HAYES, a Justice of the Supreme Court of the
State of New York, County of Kings, the Supreme Court of the
State of New York, County of Kings, and Hon. Eugene Gold,
District Attorney, County of Kings, Respondents-Appellees.
 No. 435, Docket 78-2116.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 8, 1978.
Decided Jan. 2, 1979.
 
 Paula A. Sweeney, Sp. Litigation Unit, The Legal Aid Society, New York City (Leon B. Polsky, New York City, of counsel), for petitioner-appellant.
 Barry R. Fertel, Deputy Asst. Atty. Gen. of the State of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellee Hayes.
 Joel M. Goldberg, Asst. Dist. Atty., Kings County, Brooklyn, N. Y. (Eugene Gold, Dist. Atty., Brooklyn, N. Y., of counsel), for respondent-appellee Gold.
 Before KAUFMAN, Chief Judge, and SMITH and VAN GRAAFEILAND, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 In this worrisome case, a state trial judge's clumsy effort at comedy, which took the form of a practical joke played on defense counsel at a crucial stage in a criminal proceeding, led the attorney to move for a mistrial. The motion was granted. The defendant now claims that he cannot be retried because the judge's outlandish conduct deprived him of the opportunity of going to the jury. Regrettably, we are required to hold that the law prevents us from invoking the double jeopardy clause to bar a second trial in the absence of proof that the judge acted in bad faith, causing actual prejudice to the defendant.
 
 I.
 
 2
 Rudolph Drayton was apprehended on March 13, 1977, and charged with having robbed the owner of a laundromat in Brooklyn seven months earlier. He was tried[1] before Justice Gerald S. Held in New York State Supreme Court. The only witness for the prosecution was the victim of the crime, Fritz Pierre Pierre, whose identification of Drayton on the street precipitated his arrest.
 
 
 3
 Drayton presented an alibi defense worthy of the creator of the "locked room" mystery genre.[2] He could not have been the culprit, he contended, because on the day of the robbery, he was in a secure observation ward at the Creedmoor Psychiatric Center in Queens, having attempted suicide the day before. He produced medical records from Creedmoor that substantiated this assertion, along with two witnesses who provided further corroboration. Robert Ragland, a minister and probation officer, stated that he had persuaded Drayton not to jump off a 26th floor ledge and had taken him to Queens General Hospital. Dr. Rudolpho Varias, the psychiatrist in charge of the locked ward at Creedmoor to which Drayton had been transferred, testified that hospital records indicated that Drayton was admitted on August 18, 1976, and released on August 27, nine days later.
 
 
 4
 The success or failure of this alibi defense turned on the ability of the State to cast doubt on its validity through rebuttal witnesses, and hence the availability of such witnesses became a central issue at trial. Frank Markus, Drayton's attorney, had notified the State in advance of his intent to present alibi evidence, as required by New York's criminal discovery provision.[3]
 
 
 5
 The assistant district attorney, Kenneth Ramseur, did not give the timely notice required by the same statute of his intention to produce rebuttal witnesses. Eventually, however, he did advise both the Court and defense counsel that he proposed to call only one such witness, a television newsman who had reported on the inadequacy of the security measures at Creedmoor two years earlier. On the fourth day of trial, Justice Held, having ruled this testimony inadmissible as irrelevant and immaterial, suggested that the State communicate with a personal friend of his who worked for the Department of Mental Hygiene, with a view to securing alternative rebuttal evidence. To allow Mr. Ramseur sufficient time to prove that Drayton could have escaped from the putatively secure facility, the judge adjourned the trial until 11:00 the next morning. This expedient proved unavailing, however, for early the following day, Ramseur informed Markus that no further rebuttal witnesses had been uncovered. Markus, who had conscientiously spent the previous night preparing surrebuttal witnesses, accordingly turned his attention to his closing statement.
 
 
 6
 At 10:00 a. m., before the jury entered the courtroom, Ramseur advised Justice Held that the State would rest without presenting any rebuttal testimony. The following extraordinary colloquy then took place:
 
 
 7
 Justice Held: Ken (Ramseur) do me a favor, go along with this just for fun, Frank Markus likes to talk. When Markus comes back in here, I want you to tell him that you're going to call rebuttal witnesses.
 
 
 8
 Ramseur: Do you think we ought to? I've already told him I wasn't going to call anybody.
 
 
 9
 After further coaxing from the judge, however, the prosecutor overcame his reluctance and agreed to participate in the hoax. Markus soon arrived in the courtroom, and the stage was set. As the court reporter who was evidently advised that the charade was to be off the record pretended to record the "proceedings," Ramseur made a special application to call five members of the Creedmoor professional staff as rebuttal witnesses that afternoon. As can readily be imagined, Markus immediately rose to object, and argued for several minutes that this eleventh hour request should be denied because of the prosecutor's bad faith. Justice Held then interrupted him, advising him to "sit down and relax", because the application was a "put-on".
 
 
 10
 The jury returned to the courtroom several minutes later, and Held directed Markus to deliver his closing argument. Defense counsel did not ask for an adjournment, or in any other way indicate that the unseemly practical joke had upset him. Rather, he delivered the summation to the jury. It was only after the luncheon recess and further reflection that Markus moved for a mistrial on the basis of judicial and prosecutorial misconduct. Markus argued that the hoax played upon him at a critical juncture of the trial had completely unnerved him, thus making it difficult for him to deliver an effective summation to the jury. He further contended that the judge had openly read a newspaper during his summation, conveying to the jury the impression that he believed the defense arguments were frivolous.[4]
 
 
 11
 The judge, despite his expression of "amazement" at the request, stated that he would grant the motion for a mistrial "to avoid the appearance of wrongdoing", but denied the defense motion that he disqualify himself from presiding over the second trial.
 
 
 12
 The defense then proceeded to seek a writ of prohibition from the Appellate Division, arguing that a second trial was barred by the double jeopardy clause. That court rejected the constitutional claim, but did disqualify Justice Held from further participation in the case. Moreover, to prevent the state from improving its case, the court directed the district attorney to stipulate that he would not call rebuttal alibi witnesses on retrial.[5]
 
 
 13
 Having been denied leave to appeal by the New York Court of Appeals, Drayton petitioned for a writ of habeas corpus in federal district court. Judge Platt found that Justice Held had not acted in bad faith, and that no prejudice had resulted from the hoax. Accordingly, he denied the petition. This appeal followed.
 
 II.
 
 14
 We are first confronted with a challenge to our jurisdiction. Prior to seeking federal habeas corpus relief, a detainee must exhaust his state remedies by fairly presenting his federal constitutional claim in the state courts. 28 U.S.C. § 2254(b), (c). As we explained in Fielding v. LeFevre, 548 F.2d 1102, 1106 (2d Cir. 1977), the exhaustion requirement is not "a formal hurdle placed in the way of meritorious claims, but an essential element of federalism in the administration of criminal justice." The policy of affording the state courts an opportunity to address and rectify errors of constitutional dimension is especially compelling where the petitioner has sharply called into question the conduct of a state trial judge. Id.
 
 
 15
 We are satisfied that Drayton has fully exhausted his state remedies in this case. In the Appellate Division, he was denied the writ of prohibition with which he sought to preclude the second trial. He then unsuccessfully sought leave to appeal to the New York State Court of Appeals.[6] The State now urges in addition that considerations of federalism bar any relief in advance of the second trial.
 
 
 16
 As the habeas corpus remedy is structured, however, once the petitioner has exhausted his state remedies, there is no further bar to the assumption of federal jurisdiction, for the deference owed to the state judicial system demanded by principles of comity and federalism has been paid. This holds true in the double jeopardy context, even when the petition is entertained in federal court before the second trial has commenced. See Arizona v. Washington, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (double jeopardy claim of state prisoner examined on merits pretrial); Dunkerley v. Hogan, 579 F.2d 141 (2d Cir. 1978) (same).
 
 
 17
 The rationale for granting a pretrial writ of habeas corpus in double jeopardy cases is evident. The double jeopardy clause provides protection not only from exposure to repeated risks of conviction but from the ordeal of multiple trials. Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); Dunkerley v. Hogan, supra, 579 F.2d at 145. Subjecting an individual to a second trial even where the first was never completed may be exceedingly unfair because of the emotional stress and the prolonged stigma, stemming from an unresolved accusation, it engenders. Arizona v. Washington, supra, 434 U.S. at 503, 78 S.Ct. 221. The very constitutional right claimed by Drayton and the rationale for it, therefore, would be violated if he were compelled to raise his double jeopardy claim after the second trial. United States ex rel. Russo v. Superior Court, 483 F.2d 7, 12 (3d Cir.), Cert. denied, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973); United States v. Lansdown, 460 F.2d 164, 171-72 (4th Cir. 1972).[7] Accordingly, we turn to the merits of Drayton's argument.
 
 III.
 
 18
 The identity of the party who moves for a mistrial is a crucial factor in double jeopardy analysis. Under United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), a trial judge should not grant a mistrial Sua sponte, or at the instance of the prosecutor, until he has canvassed procedural alternatives that might cure the defect. See United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). See generally Note Mistrial and Double Jeopardy, 49 N.Y.U.L.Rev. 937, 943-46 (1974). Unless the declaration of a mistrial is a "manifest necessity," the defendant has been deprived of his right to pursue the trial to a conclusion before the original tribunal and perhaps an acquittal. Under such circumstances, retrial is precluded. United States v. Jorn, supra, 400 U.S. at 484, 91 S.Ct. 547.
 
 
 19
 Different considerations obtain if the mistrial is declared on the defendant's motion, for the course followed is that chosen by the accused. United States v. Scott, 437 U.S. 82, 98 S.Ct. 2187, 2194, 57 L.Ed.2d 65 (1978); United States v. Dinitz, 424 U.S. 600, 608-09, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Any barrier to reprosecution is, therefore, ordinarily removed. Nevertheless, in exceptional cases, the defendant's decision to move for a mistrial may be considered voluntary in only the most formal sense. Where circumstances attributable to "prosecutorial or judicial overreaching" lead the defendant to request a mistrial, retrial is forbidden. United States v. Jorn, supra, 400 U.S. at 485, 91 S.Ct. 547.[8]
 
 
 20
 In the paradigmatic case of overreaching, the judge or prosecutor intentionally provokes the defendant into asking for a mistrial, thereby obtaining a second and perhaps more favorable opportunity to convict. United States v. Dinitz, supra, 400 U.S. at 611, 96 S.Ct. 1075, 47 L.Ed.2d 669; See Moroyuqui v. United States, 570 F.2d 862, 864 (9th Cir.), Cert. denied, 435 U.S. 997, 98 S.Ct. 1651, 56 L.Ed.2d 86 (1978). Even absent such a provocation, retrial is prohibited if the judicial or prosecutorial error was "motivated by bad faith or undertaken to harass or prejudice" the petitioner. Lee v. United States, 432 U.S. 23, 33-34, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80 (1974). Because of the complexities and dynamics of the trial itself, Inadvertent error will inevitably occur in a not insignificant number of cases yet the cost to society of barring retrial in all such instances would be too great. See United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). But, bad faith conduct is not an inevitable part of the trial process; rather, it signals a breakdown in the integrity of judicial proceedings, and no defendant may be required to suffer a second trial because of that event.
 
 
 21
 Drayton argues with some force that inasmuch as there was not even a superficially legitimate basis for carrying out the hoax, Justice Held's conduct must be defined as overreaching. The judge's action was manifestly not inadvertent, nor was it merely an abuse of judicial discretion, as in Dinitz, supra. A Per se prophylactic rule such as Drayton proposes, however, would preclude a second trial even if the trial judge merely failed to exercise good judgment, or acted in a negligent fashion, and would excise the intent requirement altogether. Moreover, such a rule would bar our considering whether the defendant was actually prejudiced by the misconduct.
 
 
 22
 The Supreme Court has not decided if intentional misconduct is sufficient to trigger the protection of the double jeopardy clause, or if actual prejudice stemming from the misbehavior is essential. Significantly, however, in every case in the lower courts in which overreaching has been found, the court either ruled that serious prejudice must be alleged, E. g., United States v. Kessler, 530 F.2d 1246, 1254-58 (5th Cir. 1976), or that intent to harass could be inferred from the fact of actual harm to the defendant, E. g., United States v. Martin, 561 F.2d 135, 139-40 (8th Cir. 1977). This result is dictated by the logic of the overreaching exception itself, since in the absence of actual prejudice, the defendant's decision to ask for a mistrial is clearly voluntary a strategic choice, not compelled by the nature of the defect in the trial.
 
 
 23
 Because Per se rules are inappropriate in the mistrial context, and every case turns on its own facts, Downum v. United States, 372 U.S. 734, 737, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), we must advert to the record to determine if Justice Held acted in bad faith, causing prejudice to Drayton.
 
 IV.
 
 24
 We have already been critical of Justice Held's conduct at the trial. The prank was not worthy of a New York State Supreme Court Justice. The trial judge's poor taste was exceeded only by his astonishingly bad judgment. We cannot conclude from the record before us, however, that Justice Held was motivated by a desire to prejudice or harass Mr. Markus and his client.
 
 
 25
 Mr. Markus, an experienced legal aid attorney, evidently has tried many cases before Justice Held, and the record[9] indicates that their relationship was a cordial one. In his motion for a mistrial, Mr. Markus himself alluded to the fact that he and the judge had bantered in chambers, and that "we have laughed about various things . . . ." And Justice Held, perplexed by the motion for a mistrial, responded that he had always believed that they enjoyed "a very fine, cordial, warm, and relaxed relationship" a sentiment in which Markus readily joined.
 
 
 26
 Although we find Justice Held's perplexity to be obtuse, we also believe it to be genuine. The record discloses that after the first day of trial, Mr. Markus attended a birthday party for the Judge in his chambers. Under these unusual circumstances, Justice Held's behavior is much more readily attributable to an excess of high spirits than to animus or bad faith. In this connection, it is also important to note that Drayton and his attorney have failed to establish that their cause was prejudiced by this incident. The only claim of prejudice is predicated on the assertion that Markus was totally unnerved by the joke. But his failure to ask for a mistrial or even an adjournment to compose himself at the time the incident occurred belies this contention, as does his summation, which from the cold record appears to us to have been adequate. Coming as it did after the luncheon recess, the mistrial motion was a mere afterthought, and not the product of actual prejudice.
 
 
 27
 Affirmed.
 
 
 
 [1]
 Thomas McQueen, a co-defendant, is not a party to this appeal
 
 
 [2]
 See I. Zangwill, The Big Bow Mystery (1892)
 
 
 [3]
 New York Criminal Procedure Law § 250.20
 
 
 [4]
 Markus also claimed that his summation had been disrupted by the lengthy and frivolous objections of the prosecutor
 
 
 [5]
 The State agreed, on the condition that the defense would promise not to call any additional witnesses. Drayton consented to this proviso
 
 
 [6]
 The State's argument that we should abstain from passing on the question because the highest court in the State has not ruled on the merits rings particularly hollow since the State urged the New York Court of Appeals not to grant leave to appeal. It is sufficient that Drayton sought review by that tribunal
 
 
 [7]
 Under our analysis, Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny, cited by the appellees, is simply inapposite
 
 
 [8]
 The Second Circuit has never had occasion to consider this doctrine. See United States v. Estremera, 531 F.2d 1103, 1110 (2d Cir.), Cert. denied, 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976)
 
 
 [9]
 We note in passing that Judge Platt's partial reliance on 28 U.S.C. § 2254(d), which creates a presumption in habeas corpus cases that the factual findings of the state court are correct, was misplaced. The factual findings in question were made by the Appellate Division, based solely on the trial court record. Since Judge Platt had this record before him, as do we, § 2254(d) is inapplicable