**UNITED STATES of America, Appellee,**

v.

**Peter RIVERA, Jr., a/k/a "Little Pete", Pedro Rivera, Sr., Sonia Rivera, August Laguer, Defendants,**

**Appeal of Sonia RIVERA, Pedro Rivera, Sr., August Laguer, Defendants-Appellants.**

**No. 1564, Dockets 86–1194, 86–1195 and 86–1199.**

United States Court of Appeals, Second Circuit.

Argued Aug. 15, 1986.

Decided Aug. 28, 1986.

Thomas O'Brien, New York City (The Legal Aid Society/FDSU, New York City), for defendant-appellant Pedro Rivera, Sr.

Richard L. Huffman, New York City (Baden, Kramer, Huffman & Brodsky, of counsel), for defendant-appellant Sonia Rivera.

Dwight L. Greene, Hempstead (Hofstra Law School, of counsel), for defendant-appellant Laguer.

Arthur W. Mercado, New York City, Asst. U.S. Atty., S.D.N.Y. (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Warren Neil Eggleston, Asst. U.S. Atty., of counsel), for appellee.

Before PRATT and MINER, Circuit Judges, and RE, Chief Judge of the United States Court of International Trade, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

Appellants Pedro Rivera, Sr. ("Pedro"), Sonia Rivera ("Sonia"), and August Laguer were indicted along with Peter Rivera, Jr. ("Peter") and others for their alleged involvement in a conspiracy to distribute heroin, as well as for other narcotics and weapons offenses. In the course of the trial on those charges the district judge granted appellants' motions for a mistrial. Contending that the prosecutor and the judge had engaged in misconduct compelling their mistrial motions, appellants moved to dismiss the indictment on the ground that retrial would constitute double jeopardy. The United States District Court for the Southern District of New York, John M. Walker, *Judge,* denied appellants' recusal motion and, without holding a hearing, rejected their double jeopardy contentions. This interlocutory appeal pursuant to *Abney v. United States,* 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977), followed.

After hearing argument by counsel on August 15, 1986, we "reject[ed] appellants' position that a retrial in these circumstances in light of the conduct of the trial judge and the prosecutor would violate their double jeopardy rights". We announced our decision in a summary order filed on August 28, 1986, indicating that this formal opinion would follow. For the reasons stated in that order and herein, we affirm.

## BACKGROUND

Shortly before the scheduled trial date, the district judge received an *ex parte* affidavit from the assistant United States attorney ("AUSA") responsible for the prosecution of this matter notifying the judge "of potential conflicts of interest which Peter Rivera Jr.'s lawyer in the instant case may have." The affidavit detailed the contents of an interview between the AUSA and a government witness, Gilbert Bonilla, whom the AUSA identified as a worker for Peter's heroin organization. The potential conflict came to light when Bonilla informed the AUSA that he had perjured himself in an unrelated state murder trial in 1983 at the direction of an attorney.

As explained in the affidavit to the district judge, Bonilla told the AUSA that in 1983 he had been selling drugs for Rafael Rivera—not a party in the present action—and as collateral for a debt owed to Rafael, had given Rafael a gun. In February of that year, Rafael was charged with a murder committed with that weapon. Bonilla agreed to testify for Rafael, and when he met with Rafael's attorney in court the lawyer asked him to "lie a little bit" by testifying that he owned the gun and that he had left it loaded without warning Rafael at the time he lent it to him. In addition, the lawyer told Bonilla to recant an earlier statement made to the police that Rafael was a drug dealer. After twice rehearsing this script with the lawyer, Bonilla said he testified as coached.

When the AUSA asked for the name of that attorney, Bonilla said he was not certain but he believed it to be "Salaway". This revelation prompted further inquiries by the AUSA, because counsel for Peter in the present action was one Kenneth Salaway. The AUSA's questioning of court personnel involved in the 1983 murder trial revealed that Rafael's attorney in that prior proceeding had been Kenneth Schreiber, Kenneth Salaway's law partner.

Further, the AUSA's *ex parte* affidavit indicated that another government witness had told of an incident that purportedly had occurred in 1978 at a nightclub called the Latin Palace where, that witness alleged, he and others were snorting cocaine with attorneys Salaway and Schreiber, and that Schreiber had once appeared in court all "coked up". However, because Judge Walker correctly noted later in the trial that all reference to those statements would have been excluded as entirely irrelevant, they need not further concern us on this appeal.

Citing *United States v. Cancilla,* 725 F.2d 867, 869–71 (2d Cir.1984), the prosecutor suggested in his affidavit that the above information represented a *per se* conflict of interest between Peter and his

counsel, Kenneth Salaway, and requested "[a]t the very least * * * a pre-trial conference with Mr. Salaway and Peter Rivera, Jr. at which Peter Rivera, Jr. would be advised of the potential conflict and made aware of his options."

One day after receiving the affidavit, Judge Walker held an *in camera* hearing to probe the possible conflict. In attendance were the AUSA, attorney Salaway, and Peter; none of the other defendants or their counsel was informed of the proceeding. Judge Walker characterized the dilemma confronting Peter as the possibility

> that there would be a skewing or a potential for skewing the testimony of this witness on cross-examiantion, perhaps an incentive on the part of counsel for the defendant not to probe in certain areas or to somehow tailor his questions so as to, in effect, minimize the damage or potential damage that the witness could do to either counsel or counsel's partner. Therefore, the danger of course is that effective representation of the defendant would be jeopardized.

Salaway, on behalf of himself and his partner, denied the allegations made by Bonilla and the other government witness and concluded that he could continue to represent his client effectively. Likewise, Peter informed the court that he wanted Salaway to remain as his lawyer. Nevertheless, at the suggestion of the government, Judge Walker appointed an independent attorney to advise Peter on the ramifications of the potential conflict.

On the following day, after consulting with the independent counsel appointed by the court, Peter again indicated his desire to continue with Salaway as his attorney, and Judge Walker secured a waiver from Peter with respect to any rights implicated by that conflict. The judge allowed the case to proceed in that posture, pending a determination of whether the potential conflict could be waived in light of this court's virtually simultaneous decision in *United States v. Iorizzo*, 786 F.2d 52 (2d Cir.1986). In addition, to protect the reputations of attorneys Salaway and Schreiber, the court ordered to be sealed the AUSA's affidavit and the transcript of the two days of hearings.

Codefendants Pedro, Sonia, and Laguer and their attorneys first learned of the foregoing on the first day of trial when, pursuant to 18 U.S.C. § 3500, the government produced Bonilla's prior statements and Salaway discussed the allegations with his co-counsel. After Sonia's counsel indicated that, depending on Bonilla's testimony, he might want to call Salaway as a witness to deny Bonilla's allegations, the court directed the AUSA to make a proffer of Bonilla's testimony on the perjury incident. After further discussion, the judge ordered the affidavit and hearings held *in camera* unsealed to the parties. Counsel for Pedro, Sonia, and Laguer then requested mistrials on the chance that Bonilla might implicate Salaway, which they alleged would have a spillover prejudicial impact on them. The district judge denied those motions on the theory that any claim of prejudice to the other defendants was then too speculative since Bonilla had not yet implicated Salaway in front of the jury.

In the midst of this colloquy, Salaway informed the judge that Peter was having second thoughts about going forward with Salaway as his counsel. Judge Walker decided to hold Peter's concerns in abeyance until Bonilla's testimony was heard. At that point counsel for Pedro, Sonia, and Laguer renewed their previously denied mistrial motions to be considered in the event Salaway was permitted to remain in the case.

On the government's direct examination, Bonilla acknowledged his prior perjury but did not name either Salaway or Schreiber. Nonetheless, at the conclusion of the government's questioning and before cross-examination began, counsel for Pedro, Sonia, and Laguer again renewed their mistrial motions, and the independent counsel for Peter again informed the court that Peter wished to have Salaway discharged as his attorney. The court granted Peter's motion and discharged Salaway; necessarily, he also declared a mistrial as to Peter.

The attorneys for Pedro and Sonia deferred to Laguer's counsel, Dwight Greene, to conduct the cross-examination of Bonilla. Early in his questioning, Greene addressed Bonilla's prior perjury. Not content with Bonilla's admission of having falsely testified at the request of an attorney, he asked: "Isn't it a fact that you remembered that lawyer's name as being Mr. Salaway?" Bonilla responded that the attorney's name was something like Salaway, but when asked if he could identify Salaway, Bonilla pointed to Pedro's counsel, who by then had taken Salaway's vacated seat at the defense table. Bonilla later conceded that he was confused with respect to the identity of the lawyer who had coached his perjury on the earlier murder trial.

In light of the revelation of Salaway's name through Laguer's counsel's cross-examination of Bonilla, Sonia again renewed her motion for a mistrial, suggesting that the government and the court had engaged in misconduct by not including all defendants in the in camera proceedings. Pedro and Laguer later joined in Sonia's motion. Finally, after hearing further argument, the court granted all defendants' mistrial requests. On this appeal, defendants now urge that retrial should be foreclosed because the judge's and the prosecutor's conduct of the in camera proceedings without the knowledge of all defendants effectively forced them to seek a mistrial and thereby forego their rights to have their case decided by the first jury.

## DISCUSSION

### I. Appellants' Double Jeopardy Claims.

Guaranteeing that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb", the fifth amendment embodies a general policy against multiple prosecutions and punishments for the same crime.

The * * * idea [underlying the double jeopardy clause], one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Green v. United States, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

■ Because judicial application of the clause recognizes a criminal defendant's "valued right to have his trial completed by a particular tribunal", Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), the critical double jeopardy inquiry in the mistrial context is whether the defendant sought or consented to the mistrial, see Drayton v. Hayes, 589 F.2d 117, 121 (2d Cir.1979). When the defendant requests a mistrial, he is deemed to have deliberately elected "to forgo his valued right to have his guilt or innocence determined before the first trier of fact." United States v. Scott, 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Absent the defendant's consent, a long-standing rule establishes that retrial is barred unless there was a "manifest necessity" for the mistrial declaration, the classic example of which is a hung jury. See United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

■ At issue on this appeal is the one exception to the rule governing defense-requested mistrials. That exception allows a defendant to invoke the double jeopardy bar when his mistrial request is compelled by governmental misconduct so egregious that he must abandon his right to take his case to the first trier of the facts. See Oregon v. Kennedy, 456 U.S. 667, 673, 102 S.Ct. 2083, 2088, 72 L.Ed.2d 416 (1982). In this case, appellants protest that the pretrial "secret proceedings" concerning the possible conflict with Peter's attorney ensured that once Bonilla's allegations against Salaway became known, appellants

ultimately would be compelled to move for a mistrial.

### A. *The Standard Generally.*

In *Oregon v. Kennedy,* 456 U.S. 667, 677–79, 102 S.Ct. 2083, 2090–91, 72 L.Ed.2d 416 (1982), the Supreme Court enunciated the standard for measuring allegations that prosecutorial misconduct compelled a defendant's mistrial motion. Because appellants here assert claims of both prosecutorial and judicial misconduct, we must decide whether the same test should be applied to both allegations. Since we conclude that under the *Kennedy* standard appellants have no claim with respect to the conduct of the AUSA, the decisive inquiries on this appeal are whether a different standard should be applied to assess a judge's conduct, and, under whatever standard does apply, whether the trial judge's conduct precludes a retrial here.

The *Kennedy* decision provides:

We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the *conduct* giving rise to the successful motion for a mistrial *was intended to provoke the defendant into moving for a mistrial.*

*Id.* at 679, 102 S.Ct. at 2091 (emphasis added). In so holding, the Court disavowed earlier precedent that arguably afforded the double-jeopardy bar to defendants compelled to move for a mistrial, not as the result of any intent to provoke a mistrial, but due merely to prosecutorial or judicial over-reaching or prejudicial conduct. *See id.* (quoting *United States v. Dinitz,* 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion)).

By quoting prior Supreme Court authority discussing prosecutorial and judicial mis-

conduct as one unit, the *Kennedy* Court, the government argues, indicated that the conduct of judges and prosecutors should be similarly reviewed. *See Kennedy,* 456 U.S. at 678, 102 S.Ct. at 2090 (quoting *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557); *cf. United States v. Singer,* 785 F.2d 228, 240 (8th Cir.1986) (*Kennedy* Court referred to prosecutorial and judicial misconduct "as if in one breath"). Indeed, Justice Stevens's separate opinion in *Kennedy* noted that although that case dealt with allegations of only prosecutorial error, the exception to the general rule on defendant-requested mistrials "also encompasses comparable judicial misconduct." 456 U.S. at 683 n. 12, 102 S.Ct. at 2093, n. 12 (Stevens, *J.,* concurring in the judgment). Moreover, the ninth and eleventh circuits have since addressed allegations of judicially provoked mistrials under the *Kennedy* standard, albeit without extensive analysis. *See United States v. Mitchell,* 736 F.2d 1299, 1304 (9th Cir. 1984), *cert. denied,* — U.S. —, 106 S.Ct. 94, 88 L.Ed.2d 77 (1985); *United States v. Miller,* 742 F.2d 1279, 1285 (11th Cir.1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 340 (1985).

Appellants, on the other hand, urge that a judge should be held to a more exacting standard than a prosecutor, because the judge's function is to ensure a fair trial, while a prosecutor is acting as the defendant's adversary. *Cf. Singer,* 785 F.2d at 240. Thus, appellants contend that judges should be held to the alternative "over-reaching" standard found in *Dinitz,* 424 U.S. at 611, 96 S.Ct. at 1081, and *Jorn,* 400 U.S. at 485, 91 S.Ct. at 557, and applied by this court in *Drayton v. Hayes,* 589 F.2d 117, 122 (2d Cir.1979).

We reject appellants' invitation to declare a separate standard for judges from that enunciated in *Kennedy.* First, no Supreme Court authority suggests that a different measure should be employed to test judges' conduct; in fact, as we noted earlier, a long line of cases indicates that judges and prosecutors should be similarly treated in evaluating double jeopardy claims following a defendant-requested mistrial. *See, e.g.,*

*Kennedy*, 456 U.S. at 677–79, 102 S.Ct. at 2090–91 (quoting cases referring to prosecutors and judges); *Lee v. United States*, 432 U.S. 23, 33–34, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80 (1977) (examining judge's and prosecutor's conduct under the same standard); *Dinitz*, 424 U.S. at 608, 96 S.Ct. at 1080 (referring to "judicial or prosecutorial error"); *Jorn*, 400 U.S. at 485 & n. 12, 91 S.Ct. at 557 & n. 12 (discussing a mistrial motion "necessitated by judicial or prosecutorial impropriety").

Second, a less exacting test for judges would not necessarily serve the interests of criminal defendants in general. Inevitably some errors will be made during every criminal trial, and trial judges should feel free to grant a mistrial when they conclude that a given error is incurably prejudicial. Since there is no way, under the amorphous "overreaching" standard, to decide accurately when such a trial error would cross the line, trial judges would frequently be left to consider the potential bar of double jeopardy before granting a mistrial at the defendant's request. In doubtful cases, judges would likely be less willing to grant otherwise meritorious mistrial requests. Thus, by discouraging trial judges from granting mistrials, the less exacting test for judges now urged by appellants would tend to erode the very protections the double jeopardy clause was meant to provide, a consequence the Supreme Court has cautioned against:

> If a mistrial were in fact warranted under the applicable law, of course, the defendant could in many instances successfully appeal a judgment of conviction on the same grounds that he urged a mistrial, and the Double Jeopardy Clause would present no bar to retrial. But some of the advantages secured to him by the Double Jeopardy Clause—the freedom from extended anxiety, and the necessity to confront the government's case only once—would be to a large extent lost in the process of trial to verdict, reversal on appeal, and subsequent retrial.

*Kennedy*, 456 U.S. at 676–77, 102 S.Ct. at 2089–90.

Applying *Kennedy's* intentional misconduct test to judges as well as prosecutors will maximize the protections afforded criminal defendants by leaving judges free to grant a mistrial in the event of perceived prejudicial trial error, while at the same time guarding against the rare judge who, sensing an acquittal, might overstep his authority and seek to provoke a defendant's mistrial motion. Reprosecution after such intentional misconduct the double jeopardy clause will not tolerate, for the system breaks down when a judge intercedes to manipulate the process and deprive a defendant of his right to go before his first trier of the facts. *See United States v. Tateo*, 377 U.S. 463, 468 n. 3, 84 S.Ct. 1587, 1590 n. 3, 12 L.Ed.2d 448 (1964).

■ For the foregoing reasons, we conclude that the intentional misconduct standard, which in *Kennedy* was held to govern evaluation of the conduct of prosecutors under the double jeopardy clause following a defendant's request for a mistrial, should also apply to reviewing a trial judge's actions. In so deciding, we note that any inconsistency between this holding and our earlier decision in *Drayton*, 589 F.2d at 121–22, is mandated by the Supreme Court's intervening decision in *Kennedy*, since the broader language in *Drayton* had relied on earlier Supreme Court authority that referred to both judges and prosecutors, authority which was expressly limited in *Kennedy, id.* at 121; *see Kennedy*, 456 U.S. at 677–79 & n. 8, 102 S.Ct. at 2090–91 & n. 8.

B. *Application of the* Kennedy *Test.*

■ A careful review of the record in this case reveals no conduct by either Judge Walker or the AUSA "intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 679, 102 S.Ct. at 2091. Indeed, the judge's and the prosecutor's actions—although in hindsight perhaps not the best possible choices—were scrupulously designed to avoid any prejudicial impact on the trial.

Judge Walker found that the facts and circumstances allowed no inference "that the prosecutor in this case intended 'to subvert the protection afforded by the Double Jeopardy Clause'", *United States v. Rivera*, 634 F.Supp. 204, 212 (S.D.N.Y.1986) (quoting *Kennedy*, 456 U.S. at 676, 102 S.Ct. at 2089), that finding is fully supported by the record. Upon discovering Bonilla's allegation that Salaway had suborned perjury in an unrelated state action, the AUSA promptly advised the judge of the potential conflict and sought a hearing to advise Peter of his rights. Far from acting to provoke a future mistrial motion by appellants, the AUSA cooperated fully with the court in seeking to avoid that result.

Similarly, there are no objective facts and circumstances from which to infer an intent by the district judge to provoke appellants' mistrial motions. *See Kennedy*, 456 U.S. at 679–80, 102 S.Ct. at 2091 (Powell, *J.*, concurring) (emphasizing that the objective facts and circumstances govern the analysis of intent to provoke a mistrial). To begin with, appellants' claim is inherently implausible; it borders on the ludicrous to suggest that two weeks prior to trial the judge acted with an intent to provoke the later mistrial motions. Judge Walker did candidly acknowledge that, in retrospect, it might have been better to include all parties in the pretrial discussions of Salaway's possible conflict of interest. However, the omission of appellants from those discussions does not indicate any intent to provoke a mistrial. One can fairly infer two things from the pretrial events: (1) a scrupulous effort by Judge Walker to protect one defendant from a serious possibility that his attorney might have a conflict that could deny him a fair trial, and (2) a commendable desire to protect, if possible, the professional reputation of two members of the bar from possibly unfounded accusations of criminal misconduct.

The district judge's desire to avoid a mistrial is further borne out by his rulings on the various mistrial motions made by appellants. After learning of Salaway's potential conflict from material produced by the

government pursuant to 18 U.S.C. § 3500, Pedro, Sonia, and Laguer moved for a mistrial on the ground that there would be spillover prejudice from the allegations of misconduct by co-defense counsel Salaway. This motion was denied as premature. When Peter Rivera reconsidered his position and moved for a mistrial to obtain new counsel, the other appellants renewed their mistrial motions contingent upon the resolution of Peter's motion and whether Salaway remained in the case. Even when the court subsequently granted Peter a severance and mistrial, the court continued the trial as to the other appellants. It was not until Laguer's counsel brought out Salaway's name in cross-examining Bonilla that Judge Walker finally granted appellants' third set of mistrial motions. Had he conducted the earlier *in camera* proceedings with an intent ultimately to provoke appellants' mistrial motions, surely he would have granted, rather than denied, the earlier motions. We conclude that the objective facts and circumstances allow no inference that the judge intended to provoke a mistrial, *see Kennedy*, 456 U.S. at 675, 102 S.Ct. at 2089, his own conclusion in that regard, therefore, is fully supported by the record.

From the detached, unhurried perspective of our appellate review we note that this whole problem might have been circumvented by expressly limiting the scope of Bonilla's examination. A direction to all counsel to avoid identifying Salaway as the attorney who had allegedly suborned perjury would have preserved to defendants the opportunity to challenge the credibility of the government's informant witness, and at the same time excluded from the trial the collateral, irrelevant fact that one of defendants' counsel had participated in the witness's prior perjury. We also note that if counsel for Laguer had focused on the true issues of this case, rather than forcing a cumulative credibility issue, or possibly seeking the potential strategic advantage of a mistrial, he would have realized that all reference to Salaway was surplusage at best. The trial could then have proceeded

without Salaway's name ever being mentioned, and the jury would have been unaware of the potentially prejudicial information.

## II. *Hearing and Recusal.*

 Citing 28 U.S.C. § 455, appellants urged below that the district judge should recuse himself from deciding their double jeopardy claims because he would be a material witness at a hearing on those claims. Finding insufficient factual allegations to warrant such a hearing, and, thus, perceiving no basis to recuse himself, Judge Walker denied appellants' motions on those points.

Section 455 provides, in relevant part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

\* \* \* \* \* \*

(5) He \* \* \*:

\* \* \* \* \* \*

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

Our applications of section 455 allow that, faced with such a motion, a district judge is not automatically disqualified; he may first decide whether a hearing is necessary. *See King v. United States*, 576 F.2d 432, 437 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978); *Panico v. United States*, 412 F.2d 1151, 1155-56 (2d Cir.1969), *cert. denied*, 397 U.S. 921, 90 S.Ct. 901, 25 L.Ed.2d 102 (1970). Here, Judge Walker correctly found that appellants did not allege sufficient facts of improper judicial or prosecutorial conduct to warrant a hearing; therefore, he properly declined to recuse himself.

The order of the district court is affirmed.