# UNITED STATES of America, Appellee,

v.

# The LAROUCHE CAMPAIGN, et al., Defendants, Appellants.

## No. 88–1863.

United States Court of Appeals,
First Circuit.

Heard Oct. 5, 1988.

Decided Jan. 31, 1989.

Matthew H. Feinberg, with whom Matthew A. Kamholtz, Segal, Moran & Feinberg, Michael W. Reilly, Hausserman, Davison & Shattuck, Robert L. Rossi and Anderson & Associates, P.C., Boston, Mass., were on brief for defendants, appellants.

John J.E. Markham, II, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., and Mark Rasch, Dept. of Justice, were on brief for appellee.

Before CAMPBELL, Chief Judge, TIMBERS,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

The government charged these appellants (seven individuals, two corporations, two presidential campaign committees and one association) with fraud, 18 U.S.C. §§ 1341, 1343; conspiracy to obstruct the grand jury investigation into the alleged fraud, 18 U.S.C. §§ 371, 1503; and criminal contempt of court, 18 U.S.C. § 402. Sever-

* Of the Second Circuit, sitting by designation.

al months after their trial began, the defendants told the court that, in their view, the past and likely future length of the trial would cause several jurors severe hardship; and the defendants asked the court to excuse five jurors. The court did so. Only ten jurors remained. Defendants declined to stipulate to a trial by less than twelve jurors. And, the court then declared a mistrial. The defendants, pointing to the Double Jeopardy Clause, then claimed that the Constitution forbids the government from retrying them. The district court disagreed, 695 F.Supp. 1317. They have appealed. After reviewing the record, we agree with the district court; a new trial is perfectly proper.

### I. *Background*

The relevant chronology is as follows:

1. On October 6, 1986 a grand jury returned the original indictment in this case; the indictment was superseded twice, in December 1986 and June 1987, to include additional defendants and charges.

2. In September 1987, the district court began to select a jury. On October 19, 1987, the court completed jury selection and empaneled twelve jurors and four alternates.

3. On October 19, 1987, following empanelment of the jury, the court, at appellants' request, severed the charges against defendant Roy Frankhauser and, with the approval of all parties (except Frankhauser), proceeded to try Frankhauser first while the jury selected for trial of the other defendants remained in recess. Frankhauser's trial ended on December 10, 1987.

4. On December 17, 1987, the appellants' trial began. At that time, the court, after consulting with counsel, estimated that the trial would last about six months.

5. On March 7, 1988, in the midst of trial, the court, at defendants' request, suspended the jury trial for one week for consideration of issues and discovery requests regarding the "North Telex" and the related "Lewis, Howard, Tucker" memorandum, documents which suggested that the FBI may have contemplated infiltrating the LaRouche organization. The inquiry, however, produced neither any exculpatory, nor any relevant, material.

6. On March 25, 1988, the court again postponed the trial so that it could hold hearings about the government's failure to provide timely disclosure to the defense of FBI memoranda concerning a witness named Ryan Emerson. These hearings preempted the jury trial until the beginning of May, when the court decided to continue the jury trial (while the Emerson hearings also continued). Ultimately, the court found that, while the government's violations of its disclosure obligations were "serious," they were not deliberate and they concerned a witness, whom the government first wanted, then decided not, to have testify, a witness whom the court believed was not essential to the case.

7. On May 2, 1988, the defendants asked the court to tell the jurors that it now expected the trial to go on well past mid-July, and possibly to Christmas, and to find out what hardship that fact might cause them. Five jurors expressed considerable concern. One had scheduled an operation for July 22. A second expected to take a new university post at the end of the summer; a third had already lost her job because of jury duty; two others simply expressed concern over the length of the trial and complained of hardship. The defendants asked the court to excuse all five on hardship grounds. The government objected to excusing four of the five. It argued that certain measures could be taken to expedite the remainder of the trial and it pointed out that the trial could not continue with the remaining ten jurors (unless the defendants agreed).

8. On May 4, the district court granted the defendants' motion to excuse the jurors and, when defendants rejected

the government's offer to proceed with only ten jurors, declared a mistrial.

9. The court then set a date for a new trial. On July 19, 1988 defendants asked the court to dismiss their indictments on the ground that the Double Jeopardy Clause of the Constitution barred a new trial. On August 11, 1988, the court denied this motion. The defendants now appeal from that denial.

## II.

The appellants recognize that the Double Jeopardy clause does not ordinarily bar the retrial of defendants who themselves asked the court to declare a mistrial. *See Oregon v. Kennedy,* 456 U.S. 667, 672–73, 102 S.Ct. 2083, 2087–88, 72 L.Ed.2d 416 (1982); *United States v. Scott,* 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Indeed, the Supreme Court, in *Kennedy,* 456 U.S. at 679, 102 S.Ct. at 2091, announced that the *single exception* to this rule is that reprosecution will be barred (even where a defendant successfully moved for a mistrial) where "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." Appellants argue, however, that the *Kennedy* standard does not apply here because they did not themselves request a mistrial; hence the government cannot retry them unless the mistrial was a "manifest necessity," the standard first announced in *United States v. Perez,* 9 Wheat. 579, 580, 6 L.Ed. 165 (1824). *See Arizona v. Washington,* 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978).

Appellants' argument that they did not request the mistrial is not convincing as a matter of logic. Knowing that to grant their request would be to force a mistrial, all defendants had asked the trial court to excuse the five jurors. Indeed, counsel for one defendant said, in the presence of the others:

> I have asked, however, that the jurors—the five jurors be excused, and I continue to press their being excused. If that results in a mistrial by the fact, then that

would be the result of my motion that they be excused.

And counsel for another defendant, when asking the court to excuse the jurors, said "based upon what's happened here ... there's no question that we should have a mistrial." Given the cause (defendants' motion) and the inevitability of the known consequences, this case differs in no significant way from a case in which a defendant says the words "I want a mistrial," and we must treat it similarly. *Cf. Adkins v. Bordenkircher,* 674 F.2d 279, 283 (4th Cir.) (defendant not entitled to habeas corpus relief on double jeopardy grounds where trial court, in granting defendant's motion for a continuance, discharged the jury and declared a mistrial), *cert. denied,* 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982); *Wilkett v. United States,* 655 F.2d 1007, 1012 (10th Cir.1981) (Double Jeopardy Clause does not bar retrial because "the accused himself brings about the termination of the proceedings" where, after the government's case-in-chief, defendants successfully moved for dismissal for lack of venue), *cert. denied sub nom. Conklin v. United States,* 454 U.S. 1142, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982); *Sedgwick v. Superior Court for the District of Columbia,* 584 F.2d 1044, 1046–50 (D.C.Cir.1978) (where defendant had moved for dismissal because of prosecutors' *Brady* violations and district court declared a mistrial, Double Jeopardy Clause does not prevent retrial), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 849, 59 L.Ed.2d 42 (1979). In any case, the *Kennedy* standard applies here, where defendants clearly *consented* to the mistrial. *See United States v. Puleo,* 817 F.2d 702, 705 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 491, 98 L.Ed.2d 489 (1987); *United States v. Rivera,* 802 F.2d 593, 597 (2d Cir.1986); *United States v. Mitchell,* 736 F.2d 1299, 1300 (9th Cir.1984), *cert. denied,* 474 U.S. 830, 106 S.Ct. 94, 88 L.Ed.2d 77 (1985).

As the *Kennedy* Court noted, "[w]here prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, '[t]he important consideration, for the purposes of the Double Jeopardy Clause, is that the defendant retain *primary control*

over the course to be followed in the event of such error,'" 456 U.S. at 676, 102 S.Ct. at 2089 (quoting *United States v. Dinitz*, 424 U.S. 600, 609, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976)) (emphasis added). Here, the court found itself unable to continue the trial as a result of having granted *defendants'* motion to excuse the five jurors. And, the Double Jeopardy Clause could pose no greater bar to retrying a defendant who asks to excuse jurors than it poses when a defendant asks for a mistrial directly. *Cf. Sedgwick*, 584 F.2d at 1046–47 ("We are instructed not to apply the Double Jeopardy Clause mechanically, but to look beyond the labels of trial motions and rulings to discern the actual intentions of the parties and trial court.").

Appellants go on to argue that reprosecution is barred even under the *Kennedy* standard. The government, they say, effectively goaded them into asking the court to excuse the jurors; its misconduct is entirely responsible for the delays that led to the mistrial declaration; and, therefore the government cannot retry them. They must recognize that an ordinary prosecutorial error is insufficient for their argument, as such errors typically lead to retrials, say, after an appeal. But, they claim that the prosecution behaved so badly that we should take the prosecution as *having intentionally* provoked appellants to seek a mistrial (*i.e.,* to move to excuse five jurors).

The difficulty with this argument is not logical, but factual. Our detailed examination of the record leads us to conclude that the prosecution's "misbehavior" was not egregious, nor, for that matter did it cause the mistrial.

To understand why we conclude this, one must first understand the nature of the delay that led the trial judge to excuse the five jurors. In December 1987, the trial court believed that the trial would end sometime in June, or perhaps in early July 1988. At that time, the trial judge said that "it is now my expectation that [the trial] probably will be about a six-month trial, maybe a little more or a little less ... and I think it is unlikely that it would vary more than a month one direction or the other." But by May 1988, when he excused the jurors, the trial judge, finding that there was not even the "slightest possibility" of completing the trial by mid-July, declared that "at best the trial would not be completed until well into the fall, and under those circumstances it's clear that these jurors will be unable to proceed."

Appellants cannot claim that the judge was unreasonable in changing his prediction, extending it by ten to twenty weeks, for attorneys for appellants told the court in May that it would be "misleading the jury to tell them [the trial would end] by the end of July," that there was no "chance of [the trial] being finished before the end of September," and that the trial is "potentially going into December." On two occasions a defense attorney persuaded the court to press jurors for their reaction to the information that the case might go on until Christmas. The record is equally clear that, had the change been less dramatic, had the court thought, for example, that the trial would likely end by the end of August when one of the excused jurors would begin his new teaching job, the court would have not excused all five jurors, and would not have declared the mistrial.

Once one recognizes the nature of the relevant delay, it becomes apparent from the record that appellants cannot credibly blame the government for creating delay *sufficient* to cause the mistrial. The district judge concluded that the prosecution did not cause any *relevant* trial delay (*i.e.,* delay sufficient to significantly alter the expected end-of-trial date such that he would have to excuse five jurors). We have examined each of the three incidents to which appellants point in their effort to show the contrary. And, we conclude that the district court was clearly correct.

1. *The Frankhauser Severance.* On May 22, 1987, months before the jury was empaneled, the trial court denied a motion made by all defendants, except defendant Roy Frankhauser, to sever their trial from Frankhauser's. On October 19, 1987, after empaneling the jury, the court granted defendant Robert Greenberg's renewed motion to sever the charges against Frank-

hauser. The court then ordered that Frankhauser be tried first and that the jury empaneled for the main trial wait to proceed until after the trial of Frankhauser. Appellants argued below that this severance and initial trial contributed to juror hardship in the main trial. They argued further that the government is to blame for this delay because the government had opposed the severance motion when it was first made (*before* empanelment of the jury) but withdrew its opposition when the defendants renewed the severance motion (*after* the empanelment of the jury). Had the government withdrawn its opposition sooner, appellants said, the Frankhauser trial might have taken place before empanelment of the jury in this case, and thus not have contributed to the jurors' hardship.

The record shows, however, that appellants' arguments regarding the Frankhauser severance were without merit. Defendants initially moved to sever Frankhauser on several grounds, the strongest of which was that three defendants, including Greenberg, wanted to call Frankhauser as a witness at their own trials (which they could not do if Frankhauser was a defendant). The court denied the initial severance motion because, *inter alia*, neither Greenberg nor the two other defendants wishing to call Frankhauser as a witness had shown "that Frankhauser would in fact testify for him if the cases were severed."

On October 19, however, when the trial court granted the motion to sever Frankhauser, the circumstances favoring severance changed significantly: (1) Greenberg told the court that Frankhauser had provided "an unconditional affidavit" stating that Frankhauser "did not have any of the conversations as alleged in the overt acts with Robert Greenberg;" (2) the court decided that it would permit introduction of "evidence of Mr. Frankhauser's membership in the KKK and Nazi Party;" and, at that point, *all* the defendants (including Frankhauser) asked for the severance; (3) the court warned the parties that a separate preliminary Frankhauser trial would delay their own trial; but they still asked for severance; and, (4) the court then concluded that, although Frankhauser's severance would delay the *start* of the main trial, it would nonetheless simplify the main trial, and the main trial jurors would end up serving "*less actual time.*"

The record thus indicates to us that the government did not act unreasonably, and that, in any event, the district court's finding that the Frankhauser severance shortened the overall juror-service period was reasonable. The severance did not contribute to hardship imposed upon the main trial jurors.

2. *The "North Telex" and the "Lewis–Howard–Tucker" Hearing.* Agreements between the government and the defendants, as well as the Supreme Court decision in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), required the prosecution to make available to the defense any "exculpatory" information that the government possessed. The defendants claimed they were victims of a conspiracy by the White House, intelligence organizations, Henry Kissinger, Oliver North, various journalists and others to "get LaRouche" by infiltrating his organization. They believed that government documents showing this would exculpate them.

The government, after it searched for documents mentioning LaRouche or others told the defendants it had found no "exculpatory" material. But during the trial, the defendants, as a result of a Freedom of Information Act request made to the office of the Independent Counsel–Iran/Contra found a telex apparently sent by Oliver North, which said "Lewis was gathering information against LaRouche." The prosecution then looked for, and found, one other similar document, an FBI memorandum which contained a claim by three persons, Lewis, Howard, and Tucker, that the FBI had asked them to infiltrate the LaRouche organization. The document also indicated that no infiltration had taken place.

At defendants' request, the court postponed the trial for a week, from March 7, 1988 to March 14, 1988. During this time,

defendants pursued broad *Brady* requests, the government retrieved documents, and the court made *in camera* inspection of a significant number of documents related to Lewis, Howard and Tucker. Ultimately, the court concluded that neither the "North Telex" nor the "Lewis–Howard–Tucker" memorandum were "exculpatory." In fact, the court found that nothing in the Lewis, Howard and Tucker matter was relevant. It wrote:

> The defendants have not proffered a satisfactory explanation as to how a claim of any one of them [Lewis, Howard or Tucker] (even if supported by some admissible evidence that it was a truthful claim) that he was asked to infiltrate LaRouche organizations would be admissible on a theory of entrapment, or a so-called "CIA defense," or how it would make less compelling the inferences the government seeks to have the jury draw from evidence bearing upon the obstruction-of-justice-state-of-mind element of the conspiracy offense charged in the indictment.

Despite the fact that this inquiry yielded no significantly exculpatory material, appellants argue that the delay in the trial from the Lewis–Howard–Tucker matter should be attributed to governmental misconduct because discovery agreements between the parties required the production of the documents. We agree, however, with the district court's conclusions that "there is no basis for attributing the time spent [the week of the trial delay] on this matter to prosecutorial misconduct" because no disclosure obligations, contractual or otherwise, were violated with respect to the Lewis, Howard and Tucker materials. In any event, as the district court pointed out, "one week more or less would have had no effect on the possibility of completing the trial with twelve jurors."

3. *The Emerson Hearing.* Because of agreements made between the parties and existing law, the government was obligated to provide defendants, before trial, any material it possessed about any government witness that might help defendants in, for example, their efforts to cross examine or to impeach that witness. *See Brady, su-*pra; Jencks Act, 18 U.S.C. § 3500 (1985). On December 14, 1987, three days before the trial got under way, the government, for the first time, included on its prospective witness list the name of Ryan Emerson, a man who helped the FBI investigate the case. The government did not make available to the defense until February and March, however, documents containing prior statements Emerson had made, *see* 18 U.S.C. § 3500, documents showing that Emerson had acted as an FBI informer in other unrelated investigations, and documents explaining how he helped the FBI in this case.

The defendants asked the court to hold a hearing to determine whether the government had intentionally violated its disclosure obligations. Even though the government said it had decided not to use Emerson as a witness, the court held the hearing. The court found that the prosecution *had* violated its obligations. The prosecution ought to have made documents (showing Emerson had worked as a paid informant, that he was considered by some to be untrustworthy, and so forth) available in December, not in March. And, the court considered the violation to be "serious." But, it also found that the Jencks Act violations (*i.e.*, the delay in providing the material) was "not deliberate," that the prosecutors "have at no time made any intentional misrepresentation to the court," that they "take the government's disclosure obligations seriously" and that "defendants made thousands of discovery requests, hundreds of which required the government to conduct wide ranging searches and the overwhelming majority of which the government responded to with reasonable promptness." It added that Emerson was "not considered to be among the more important witnesses." In our view, the record adequately supports all of these findings.

The upshot is that one can hold the government responsible, at most, for the trial delay arising out of the Emerson hearing. (We say "at most" because the trial court found that defendants themselves "substantially contributed to the length of

the hearing by posing repetitive questions and questions outside of the scope of the hearing.") The Emerson matter began on February 23, 1988, when the prosecution first gave Emerson documents to the defense. The trial continued, however, through Friday, February 26. Because of a scheduled judicial meeting and prearranged three-day break, there were no proceedings in the trial during the week of February 29 through March 4. The court considered the North Telex matter the next week. The jury returned March 15; it heard evidence March 15–18, and March 21–24. The court suspended the jury trial on March 24 and conducted Emerson-related proceedings until the end of April. The court declared a mistrial on May 2. The Emerson matter therefore delayed the trial by about five weeks (or six weeks if one assumes it took some time from the trial while the jury was still sitting).

Stating that the original estimates of trial length made by counsel had been "grossly wrong on the underside," the district court granted the defendants' motion to excuse the jurors in relevant part because it believed the trial would extend into the fall, perhaps until late fall. The district court also found that the length of the trial was increased by defendants' strategy and manner of defense. The district judge stated, when dismissing the jury, that had he "known then" in December 1987, "what I know now, I would have at least doubled the [six to seven] month estimate I gave you." The court specifically found that the five weeks or six weeks (or even eight weeks) of delay that defendants claim the government caused made no difference. And, the record adequately supports that conclusion.

We add that, even were that not so, even if the Frankhauser severance, the North Telex delay and the Emerson delay had caused the added hardship that led to the jurors' dismissal, it would make no legal difference. That is because the defendants themselves asked the court to excuse the jurors and the prosecution did not bring about this motion deliberately, or through any form of egregious or unfair behavior that could be considered, objectively, as equivalent to an intentional effort to provoke a mistrial. *See Kennedy*, 456 U.S. at 679–80, 102 S.Ct. at 2091–92 (Powell, J., concurring) (arguing that "[b]ecause 'subjective' intent often may be unknowable, I emphasize that a court—in considering a double jeopardy motion—should rely primarily upon the objective facts and circumstances of the particular case"). The question as to the intent of the prosecutor calls for a court to make a finding of fact. *See Kennedy*, 456 U.S. at 675, 102 S.Ct. at 2089. And, we agree with the district court's finding that "by an objective standard of an ordinarily prudent person in the position of the prosecution, it cannot be said that the prosecution should have foreseen that its conduct would cause or contribute to a mistrial or goad the defendants into seeking a mistrial." At most, the record shows one instance in which the prosecution non-deliberately violated a disclosure obligation with respect to a prospective witness, not central to the proceedings, whom it then decided not to call. The 'error' is no greater than that of which parties typically complain when they ask for a new trial. Indeed, we have examined the facts of this case in detail, not because it presents a particularly close case on the issue presented (it does not), but because we wished to assure ourselves that there had not been significant prosecutorial misconduct. We are satisfied there has been no such misconduct. The Double Jeopardy Clause does not bar a new trial.

The judgment of the district court is

*Affirmed.*