**UNITED STATES of America, Plaintiff,**

v.

**Dennis K. KANAHELE, (01) a.k.a. "Bumpy", Gordon Kaaihue, (02), Defendants.**

**Criminal No. 95–00764 HG.**

United States District Court, D. Hawai'i.

Jan. 22, 1996.

Leslie E. Osborne, Jr., United States Attorneys Office, Honolulu, HI, for U.S.

Hayden Aluli, Honolulu, HI, for Defendant Dennis K. Kanahele.

Sidney Michael Quintal, Honolulu, HI, for Defendant Gordon Kaaihue.

*ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT WITH PREJUDICE BECAUSE RETRIAL WOULD VIOLATE DOUBLE JEOPARDY, DENYING DEFENDANT KANAHELE'S MOTION TO RECONSIDER DENIAL OF JOINT MOTION TO COMPEL DISCOVERY OF ALL PAPERS AND/OR REPORTS RELATED TO THE JURY TAMPERING ALLEGATION, DENYING DEFENDANT KANAHELE'S MOTION TO RECONSIDER DENIAL OF DEFENDANT KANAHELE'S MOTION TO RELIEVE COUNSEL OF HAWAII SUPREME COURT CONSTRUCTION OF RULES 3.5(b) AND 8.4(a) OF THE HAWAII RULES OF PROFESSIONAL CONDUCT, AND DENYING DEFENDANTS' MOTION TO RECUSE*

GILLMOR, District Judge.

### BACKGROUND

On August 2, 1995, a grand jury returned an indictment against Dennis K. Kanahele, a.k.a. "Bumpy," and Gordon Kaaihue. Kanahele and Kaaihue were both charged with knowingly and wilfully obstructing the execution of a federal arrest warrant in violation of 18 U.S.C. § 1501 (Count I). Kanahele was charged with forcibly interfering with a deputy United States Marshal in the performance of his duties in violation of 18 U.S.C. § 111 (Count II) and harboring a federal fugitive in violation of 18 U.S.C. § 1071 (Count III). On October 11, 1995, Kanahele and Kaaihue were brought to trial in this Court. The case was prosecuted by Assistant United States Attorney Leslie Osborne.

Kanahele was defended by Hayden Aluli and Kaaihue was defended by Sidney Quintal.

There are currently a number of groups of people in the State of Hawaii interested in the issue of Hawaiian sovereignty. Kanahele leads a group that has proclaimed itself the "Nation of Hawaii." Kanahele is the leader and is called the Head of State. Kaaihue serves as the group's head of security. The "Nation of Hawaii" group is committed to the idea that the United States is illegally occupying the Hawaiian islands. The organization maintains its headquarters in a rural compound, has adopted its own constitution, and has manufactured its own license plates to be used in lieu of, and sometimes in addition to, valid State of Hawaii license plates.

Throughout the trial, members of the "Nation of Hawaii" voiced their vehement opposition to having the leader of their group tried in a United States court. Supporters congregated outside the United States Courthouse with signs insisting that this Court had no jurisdiction over Kanahele, the sovereign of the "Nation of Hawaii," and demanding his immediate release. Some persons in the crowd employed bullhorns to articulate their views. As the Court initiated each day's proceedings, the focus of activity would shift to the courtroom, where "Nation of Hawaii" supporters and others filled the courtroom to witness the trial.

On October 18, 1995, shortly after the start of the trial, Assistant United States Attorney Osborne informed the Court that he had reason to believe that a list of the seated jurors was being circulated in the courtroom. He requested that the Court remind everyone that there should be no contact with any jurors during the course of the trial.

The Court gave defense counsel an opportunity to comment. After conferring with his client, defense counsel Aluli volunteered that at Kanahele's request he had given a copy of the jury list to "Mrs. Kanahele." According to Aluli, the list was desired "to engage in a spiritual endeavor." Trial Transcript, October 18, 1995, at 165. The Court noted that there was nothing wrong with prayer, but emphasized that contacting any of the jurors would be completely inappropriate. The Court specifically warned the audience that

contacting the jurors, either personally or through some other person, might constitute jury tampering.

The attorneys completed their closing arguments on Friday, October 27, 1995. The Court then instructed the jury. Through its standard preliminary instructions, the Court had instructed the jury at the beginning of the trial that they must "not do any research or make any investigation about the case on your own." (Court's Standard Preliminary Instruction No. 11). In its final instructions, the Court further advised the jury that:

In any jury trial, there are, in effect, two judges. I am one of the judges; the other is the jury. It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration. It is also my duty at the end of the trial to instruct you on the law applicable to the case.

(Court's Jury Instruction No. 1). In the very next instruction, the Court continued:

You, as jurors, are the judges of the facts. But in determining what happened in this case—that is, in reaching your decision as to the facts—it is your sworn duty to follow the law I am now defining for you. . . .

You must follow all of my instructions as a whole. You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you. That is, you must not substitute or follow your own notion or opinion as to what the law is or ought to be. It is your duty to apply the law as I give it to you, regardless of the consequences.

(Court's Jury Instruction No. 2).

At 12:19 p.m. on Friday, October 27, 1995, the jury was excused to commence their deliberations. Immediately prior to concluding the trial, the Court reminded counsel to keep the Courtroom Deputy advised of their whereabouts so that they could be recalled quickly in the event that the jury sent a communication to the Court or announced that it had reached a verdict.

At 4:30 p.m., the Court received a note from the jury regarding Jury Instruction Number 21. That instruction informed the jury that:

In order for the defendant, Dennis K. Kanahele, a.k.a. "Bumpy" Kanahele, to be found guilty of the crime charged in Count 2 [forcibly interfering with a United States Marshal in the performance of his duties], the government must prove each of the following elements beyond a reasonable doubt:

First, the defendant intentionally used force in resisting, opposing, impeding, intimidating or interfering with a United States Marshal; and

Second, that defendant did so while the United States Marshal was engaged in his official duties.

A United States Marshal who is trying to arrest a person, is engaged in his official duties.

The government need not show that the defendant had any intent to injure the United States Marshal or knew that the individual was a United States Marshal at the time he took the action alleged in Count 2 of the indictment.

(Court's Jury Instruction No. 21).

The note from the jury stated:

With regard to Court's Jury Instruction No. 21, specifically the last paragraph: "The government need not show ..." please clarify the following questions:

(1) Does the last paragraph mean we exclude facts and evidence presented because it appears the instruction is saying we have to allow anyone to enter our private property because they *may* be Marshals?

(2) Would it be possible to review the specific law stating an individual "had any intent to injure the United States Marshal ..." if any?

Given that the question was sent at 4:30 p.m., the jury was sent home for the weekend shortly after referring these questions to the Court and asked to return at 10:30 a.m. on Monday, October 30, 1995.

The Court indicated that counsel should return to court at 9:00 a.m. on Monday, October 30, 1995. The question from the

jury would then be discussed and the Court would draft an answer by 10:30 a.m., at which time the jury was scheduled to resume deliberations.

On Monday, October 30, 1995, however, defense counsel Quintal failed to appear in court at 9:00 a.m. As scheduled, the jury resumed their deliberations at 10:30 a.m. Due to Quintal's absence, however, the Court was unable to provide the jury with an answer to its inquiry at that time.

Following Quintal's arrival at 11:30 a.m., the Court proceeded to discuss the jury question and potential responses with counsel. Following an extended discussion, the response was delivered to the jury shortly after 12:05 p.m. At 11:20 a.m., the jury sent another note, which read: "The jurors would like further clarification for the terms 'harbor' and 'physical act' as used in Court's Jury Instruction No. 24." After discussing the communication with counsel, the Court's response was sent to the jury shortly after 1:44 p.m.

At approximately 3:10 p.m. on Monday, October 30, 1995, the jury sent the Court a third note in which they indicated:

> We are at an impasse. We have voted and are unable to come to an agreement as to a verdict for Counts II and III.

At 4:40 p.m., the Court consulted with counsel and solicited their input as to the advisability of giving the jury a modified *Allen* charge.

Assistant United States Attorney Osborne recommended that the Court send the jury a note advising them to continue their deliberations. Osborne's position was that the *Allen* charge should only be given if the jury continued to be deadlocked after engaging in more extensive deliberations. Defense counsel Aluli opposed giving the jury a modified *Allen* charge. Aluli argued that the Court should find manifest necessity and declare a mistrial. Defense counsel Quintal took no position, as his client was not charged with the counts upon which the jury was deadlocked.

When proceedings resumed the next day, the Court announced that it had decided to deliver the modified *Allen* charge. The Court found that the *Allen* charge was appropriate in these circumstances because the jury said it had reached an impasse after just one and a half days of deliberation. Given that the trial had lasted nearly three weeks, the Court indicated that declaration of a mistrial at that juncture would have been premature. Defense counsel Aluli noted his objection to the giving of the modified *Allen* charge. Thereafter, the jury was brought in and read the modified *Allen* charge.[1] Pursuant to the Court's instructions, the jury resumed deliberations at approximately 9:23 a.m. on Tuesday, October 31, 1995.

At 10:00 a.m. on the same day, the jury sent the Court another note. The note asked: "Can we make a decision using a law from the constitution of the United States and from the Bill of Rights (Article IV)?" The Court's law clerk noticed that the jury note referred to the Fourth Amendment to the United States Constitution as "Bill of Rights (Article IV)." On Monday morning, the previous day, the law clerk had overheard an individual make the same reference when requesting assistance from the law librarian in the United States Courthouse law library.

The law clerk related this coincidence to the Court. The Court then contacted the law librarian and questioned her in chambers about the incident. Questioning revealed the law librarian had assisted an individual the previous morning who in the course of assistance identified himself to the librarian as Robert DeCosta, a juror in the *Kanahele* case. The Court had counsel summoned and, in order to suspend jury deliberations until a determination could be reached as to how to proceed, sent the jury to lunch early, at about 11:15 a.m.

The court convened at 11:37 a.m. to discuss this latest turn of events with counsel and to consider the proper course of action. The parties then agreed that they would benefit

---

1. The Court delivered the modified *Allen* charge as set out in Instruction 7.06 of the Ninth Circuit Manual of Model Jury Instructions.

from an opportunity to reflect upon the implications of this development. It was agreed that jury deliberations should be suspended upon their return from lunch. The Court indicated it would be necessary to question the law librarian on the record. The Court asked counsel to devote some thought as to how this situation should be handled. In particular, the Court asked them to consider whether the whole process was tainted such that the jury would have to be dismissed. Recess was taken at 11:50 a.m. and court was to reconvene at 1:30 p.m. During the recess, defense counsel Aluli and Quintal questioned the law librarian who had assisted the juror.

The Court received a phone call from the United States Marshal Anne Kent shortly before court was to reconvene at 1:30 p.m. Marshal Kent told the Court that as the jury was being escorted to lunch, one of the jurors inquired of a deputy marshal whether they had ever experienced any problems with jury tampering and whether that was a serious offense. She also indicated that there may have been some interaction between the jurors and members of the public as the jurors ate lunch in the federal cafeteria.

The Court called a court reporter into her chambers and arranged to question the deputy marshal who had the interaction with the juror. The Court decided to hold the interview of the deputy marshal on the record, but without the attorneys, given the prior suggestion that the jury list had been circulated in the courtroom, the situation of a juror who had done legal research, and the nature of an inquiry about jury tampering.

At 1:50 p.m. the Court questioned the deputy marshal in chambers, completely on the record. The deputy marshal stated that as he was escorting the jurors to lunch,

> one of the jurors—and I'm not sure of his name—had just out of the blue asked me did we ever have much trouble with jury tampering around here or have I ever seen cases of jury tampering, that kind of thing. And I just informed him that I wasn't aware of any case in this district, but it's—we've had cases across the country of it and stuff like that.

And he asked me—I believe he asked if it was serious—was it a serious offense, and I said absolutely. As far as we're concerned, that and tampering with witnesses are two very serious offenses in the judicial system, and it's dealt with very harshly.

And it was really kind of dropped after that.

Trial Transcript, October 31, 1995, at 25–26.

The Court also questioned the deputy marshal with regard to whether he had witnessed any contact between the jurors and the public as the jurors ate lunch in the federal cafeteria. The deputy marshal responded:

> Not really. The only thing that I found odd, that a lot of people that have been in the trial every day eat in the cafeteria at the same time as the jury does, and a couple of them today came up and pointed out the jury to other people that are in that group. And they were at such a distance that there was nothing said or anything like that, but I mean they were pointing to the jurors, stuff like that. I'm not all that sure if the jurors even actually saw them pointing.

> But once they saw us sitting there—I was sitting like off to the side. Once they saw me, they just kind of stopped and sat down, you know. It wasn't anything malicious or anything like that, but they were definitely making a point to other people that that was the jury.

*Id.* at 26–27. The Court then asked the deputy marshal to stand by in the courtroom to identify the juror who had inquired about jury tampering. Later, after the Court had declared a mistrial and on the record at sidebar with counsel present, the deputy marshal identified Robert DeCosta as the juror who had asked about jury tampering.

At approximately 2:30 p.m. on Tuesday, October 31, 1995, court was reconvened and law librarian Patricia Butson was called as a witness. Responding to questions of the Court, the law librarian revealed that shortly after 9:00 a.m. on Monday, October 30, 1995, a man, who subsequently identified himself as Robert DeCosta, came into the law library and asked to see a copy of "Article IV of the

Bill of Rights". Law librarian Butson retrieved a treatise on the Constitution entitled "The Constitution of the United States of America: Analysis and Interpretation." She then opened the treatise to the section on the Fourth Amendment and asked whether this was what he wanted. DeCosta indicated that it was and asked whether he could make a photocopy of the amendment. Law librarian Butson explained that he could not make a photocopy in the library, but that he would be permitted to check the book out for two hours. At that point, DeCosta signed his name on a check-out card and took possession of the treatise.

At about this time, law librarian Butson also saw that DeCosta had brought a legal pamphlet into the library with him. In the pamphlet, law librarian Butson noticed that there was a two-line quotation that had been highlighted. She testified that the quotation contained a general statement to the effect that laws must be just and reasonable.

Before leaving the library, DeCosta questioned law librarian Butson about search and seizure law. She recommended that DeCosta conduct some research and referred him to the volumes on search and seizure law in the criminal law section of the library. DeCosta looked at the search and seizure books on the shelves, but ultimately opted not to review them because he said he was scheduled to resume deliberations at 10:30 a.m., thereby revealing to librarian Butson that he was a juror in the *Kanahele* case. Upon learning this, the librarian told DeCosta he should not be conducting legal research and his questions should be directed to the Court. DeCosta said that he had sent questions to the Court but did not understand the Court's responses.[2] He subsequently left the library with the treatise on the Constitution for a period of about twenty-five minutes.

The questioning of law librarian Butson completed, the Court asked for counsel's positions with regard to a mistrial. Assistant United States Attorney Osborne suggested that DeCosta must be excused from the jury for having violated the Court's order prohibiting research. Osborne also expressed concern that DeCosta's violation of his oath may have contaminated the entire jury.

Defense counsel Aluli argued that DeCosta's behavior did not violate any order of the Court. Aluli maintained that there is "[n]o doubt Mr. DeCosta knew about the Fourth Amendment and wanted to simply confirm by reading about it, which he did. I don't think it violates any order of the Court." Trial Transcript, October 31, 1995, at 53. Aluli continued, "I think the instructions you gave [are] basically ambiguous, and I don't think it should cover ... a juror's attempt to confirm what he already knows exists out there." *Id.* at 53–54. Aluli therefore maintained that there was an insufficient basis for excusing DeCosta. Aluli opposed having the Court make any inquiries to determine whether the jury had been contaminated by DeCosta's research. Defense attorney Quintal, counsel for Kaaihue, likewise objected to having a jury of less than twelve and opposed the questioning of the jurors by the Court. Both counsel indicated that they would object to the granting of a mistrial.

The Court then prepared to issue its ruling. Reviewing the situation, the Court explained that it was faced with a juror who had clearly violated the instruction not to perform outside research. The juror did not merely look at the Fourth Amendment, but checked out a treatise on the Constitution and had a legal pamphlet in his possession. Immediately after conducting this research, the juror returned to jury deliberations. There was also the specter of DeCosta's lie to the librarian that he had asked the Court questions and could not understand the answers. At the time DeCosta made that statement, no answer had been made to the jury communication as the Court was awaiting defense counsel Quintal's arrival.

The Court found as a factual matter that the juror's research had contaminated the entire jury because, the day after DeCosta conducted the legal research in the library,

---

2. Although it may be true that DeCosta was the source of the questions forwarded to the Court at 4:30 p.m. on Friday, October 27, 1995, DeCosta lied when he claimed that he was unable to understand the Court's responses, as the response to the jury's first questions would not be sent to the jury until later that same day.

the jury foreperson sent the Court a note that employed the same somewhat eccentric reference—"Bill of Rights (Article IV)"—that DeCosta had used. This unusual coincidence provided compelling evidence that the forbidden research had infected the jury's deliberations.

The Court also noted that at 3:15 p.m. on Monday, the previous day, the jury indicated that it had reached an impasse. That note from the jury had prompted defense counsel Aluli to request that the Court declare a mistrial. The jury had deliberated just two additional hours since the time that Aluli urged the Court to declare a mistrial. Moreover, the Court announced that it was now confronted with another problem in that, over the lunch break, a juror had posed a question to a deputy marshal regarding the prevalence and seriousness of the crime of jury tampering.

To further complicate the situation, both defense counsel voiced strenuous objections to removal of DeCosta as a juror and to any inquiry designed to assess the extent of jury contamination. Given this situation, the Court declared a mistrial.

Immediately after the Court issued this ruling, defense counsel altered the unequivocal positions that they had taken minutes earlier. Defense counsel Aluli now requested that the Court provide defense counsel with an opportunity to present written memoranda. Defense counsel Quintal also requested that the Court recess for the day so that they might brief the issue. The Court, however, reiterated that it had no alternative but to declare a mistrial because a juror had violated the jury instructions by conducting research and the Court had already determined as a factual matter that the research had contaminated the remainder of the jury. Given these circumstances, the Court concluded that additional time would serve no purpose—the Court believed the jury had been tainted. The Court then reaffirmed its prior ruling that a mistrial was unavoidable.

At that point, defense counsel further altered their previously expressed positions. Defense counsel Aluli now announced that he might no longer object to certain less drastic alternatives, including the removal and questioning of DeCosta to assess whether the jury had been contaminated. Defense counsel Quintal was also prompted to alter his stance, as when he indicated that he wanted to reconsider his opposition to proceeding with an eleven person jury and to an inquiry into jury contamination. Quintal explained the sudden shift by noting,

> I've probably made thirty or forty objections for the record and asked the Court not to do certain things and saw the Court do it . . . and I wasn't offended by it. And because we say that you should not and we object to your questioning Mr. DeCosta, I fully expect that the Court, if it feels like, is going to ask Mr. DeCosta, and we just preserve our objection, your Honor. And I hope that the Court doesn't overreact by us posturing just to, as we see it, protect the record as to the Double Jeopardy problem.

Trial Transcript, October 31, 1995, at 81. Quintal then completely abandoned his earlier position and suggested that his client had an open mind with regard to less drastic alternatives and "by morning we will probably have a much more open mind to solve the problem." Id. at 82. Defense counsel again requested that the Court give them more time.

After listening to counsel, the Court again reaffirmed its ruling that it had no alternative but to declare a mistrial. The Court reiterated that providing counsel with additional time would not alter the fact that the jury deliberations had been infected.

### DISCUSSION

Based on the events described above, the defendants have made a variety of motions. On December 2, 1995, defendants filed their Joint Motion to Dismiss the Indictment with Prejudice Because Retrial Would Violate Double Jeopardy. That motion contends that dismissal of the indictment is required because retrial of the defendants would violate the Double Jeopardy Clause of the Constitution.

On December 5, 1995, defendants made a joint motion requesting that the Court unseal the transcript of the October 31, 1995 state-

ment of the deputy United States Marshal questioned by the Court and that it compel discovery of all information possessed by the Federal Bureau of Investigation relating to the jury tampering investigation. On December 11, 1995, defendant Kanahele filed another motion in which he requested that the Court relieve him of Rules 3.5(b) and 8.4(a) of the Hawaii Rules of Professional Conduct and that he be permitted to conduct post-trial *ex parte* juror interviews. In a hearing held on December 26, 1995, the Court granted the motion to unseal the transcript, but denied the remainder of the December 5 and December 11 motions. On December 27, 1995, defendant Kanahele filed a Motion for Reconsideration of the denial of the motions to compel discovery of information possessed by the Federal Bureau of Investigation and to permit post-trial *ex parte* juror interviews. Defense counsel suggested that the information sought in these motions was relevant to its Joint Motion to Dismiss the Indictment on double jeopardy grounds.

Finally, on December 29, 1995, defendant Kanahele made an oral motion requesting that the Court recuse itself, alleging that the Court was too close to the factual issues and that there might be an appearance of conflict.

I. *Defendants' Motion to Dismiss the Indictment on Double Jeopardy Grounds*

■ The Double Jeopardy Clause of the Fifth Amendment protects a person from being twice put in jeopardy of life or limb for the same offense. Because jeopardy attaches before the judgment becomes final, the Double Jeopardy Clause not only prohibits a second trial following an acquittal, but also protects a defendant's "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978). Nevertheless, that right must, in some circumstances, be subordinated to the public's interest in fair trials designed to end in just judgments. *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949).

That is to say, the public has a substantial interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. *Arizona,* 434 U.S. at 505, 98 S.Ct. at 830. To accommodate these potentially conflicting interests, it is necessary to balance the protections afforded by the Double Jeopardy Clause against society's interest in determining guilt or innocence. *Wade,* 336 U.S. at 689, 69 S.Ct. at 837.

■ Retrial is therefore permitted following the declaration of a mistrial only if the defendant consented to the mistrial or if the mistrial was caused by "manifest necessity." *Weston v. Kernan,* 50 F.3d 633, 636 (9th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995). Manifest necessity exists when the ends of public justice would not be served by a continuation of the trial proceedings. *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971). As the Supreme Court has noted, the word "necessity" cannot be interpreted literally. *Arizona,* 434 U.S. at 506, 98 S.Ct. at 830–31. Rather, courts are to assume that there are degrees of necessity. *Id.* There must be a high degree of necessity in order to justify the declaration of a mistrial without the defendant's consent. *Weston,* 50 F.3d at 638.

■ When an error certain to result in reversal occurs, a trial court properly exercises its discretion in declaring a mistrial. *United States v. Bates,* 917 F.2d 388, 395 (9th Cir.1990). If an error makes reversal on appeal a certainty, it would serve no purpose to continue to a verdict because, even if the government prevailed, the decision would be reversed by an appellate court. *Id.* (citing *Illinois v. Somerville,* 410 U.S. 458, 464, 93 S.Ct. 1066, 1070–71, 35 L.Ed.2d 425 (1973)). The determination that an error was certain to result in reversal is an objective inquiry that must be based on the record as it existed at the time of trial.[3] *Bates,* 917 F.2d at 395.

■ A jury's exposure to extrinsic information does not automatically result in rever-

---

**3.** As a result, evidence that juror Robert DeCosta failed to disclose a prior felony conviction on his jury application will not be considered by this Court, as this evidence was uncovered only after the mistrial was declared.

sal. *United States v. Steele,* 785 F.2d 743, 746 (9th Cir.1986). In situations where the jury obtains or is exposed to extrinsic information, reversal is required when there existed a reasonable possibility that the extrinsic material could have affected the verdict. *United States v. Vasquez,* 597 F.2d 192, 193 (9th Cir.1979). The determination regarding whether reversal will be required depends upon a considered review of the details and circumstances of each case. *Marino v. Vasquez,* 812 F.2d 499, 505 (9th Cir.1987). In performing this review, the Ninth Circuit has recognized that:

> The trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature. He or she observes the jurors throughout the trial, is aware of the defenses asserted, and has heard the evidence. The judge's conclusion about the effect of the alleged juror misconduct deserves substantial weight.

*United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

■ In the present case, the jury had been exposed to extrinsic legal information. The evidence indicates that juror DeCosta violated the Court's instructions by performing independent legal research. At the very least, DeCosta's research efforts led him to check out a treatise on constitutional law and to secure a legal pamphlet. Juror DeCosta interjected the results of his research into the jury deliberations, as evidenced by the jury question on "the Bill of Rights (Article IV)." Confronted with these circumstances, the Court concluded that there was a reasonable possibility that the extrinsic information could have affected the verdict. As reversal would have been a certainty in such circumstances, declaration of the mistrial was proper. Accordingly, the Defendant's Joint Motion to Dismiss the Indictment on Double Jeopardy Grounds must be denied.

■ When it is not patently clear that an error will require reversal, four factors are utilized to determine whether the trial court properly exercised its discretion in declaring a mistrial. *Bates,* 917 F.2d at 395–96. First, the reviewing court must ascertain whether the trial judge heard the opinions of the parties with regard to the propriety of a mistrial. Second, the reviewing court must inquire into whether the trial judge considered alternatives to granting a mistrial. Third, the reviewing court must consider whether the trial judge acted deliberately and not abruptly. Fourth, the reviewing court must determine whether the trial judge properly determined that the defendant would benefit from a mistrial. *Weston,* 50 F.3d at 639.

■ Accordingly, if this Court were to have ruled that reversal was not a certainty, the propriety of the mistrial declaration would be analyzed under the four factor test articulated by the Ninth Circuit in *United States v. Bates,* 917 F.2d 388 (9th Cir.1990).

### A. Hearing from the Parties

Immediately after learning that a juror had disobeyed the Court's instructions by conducting independent legal research, the Court summoned counsel to the courtroom. When the Court convened at 11:37 a.m., the Court advised counsel of the situation and requested that they consider whether DeCosta's actions may have contaminated the entire jury. At 2:10 p.m., the proceedings were reconvened and the Court noted that: "When we recessed earlier, counsel asked for time to decide how to approach the problem before the Court. I'd like to have your positions at this time, please." Trial Transcript, October 31, 1995, at 28. Defense counsel Aluli responded by declaring, "Judge, my position is I don't perceive any problem...." *Id.* Similarly, defense counsel Quintal suggested "[t]here's been no indication of any misconduct by any juror. There's been no indication of any taint of the jury. We would object to any further inquiry which may lead to taint or to prejudice or the possibility of goading [the defense] into requesting a mistrial." *Id.*

The Court then called the librarian to testify as to what transpired with the juror the previous morning in the Court library. After hearing the testimony of law librarian Butson, the prosecution stated its position. As-

sistant United States Attorney Osborne maintained that, at a minimum, it would be necessary to excuse DeCosta and that it also might be necessary to question other jurors to determine whether the entire process had been contaminated.

Following the questioning of law librarian Butson, defense counsel Aluli's position remained unchanged. Aluli remarked, "I don't see anything this juror did that would cause him to be excused. I would strenuously object to the Court excusing this juror given the evidence that I've heard from Miss Butson." *Id.* at 56. To the extent that he recognized that any prejudice may have resulted from DeCosta's unauthorized research, Aluli suggested that it could be cured by giving the jury an instruction that provided them with the text of the Fourth Amendment. Aluli then reaffirmed that he would object to having DeCosta excused from the jury and that he would also oppose any effort to find out whether the jury had been contaminated.

Defense counsel Quintal also stated that law librarian Butson's testimony did not create any reason for concern. Quintal represented that he would object to having a jury of less than twelve, that he would object to having DeCosta excused, and that he would object to any questioning of either DeCosta or the jury foreperson. He further offered that "[i]t appears from the testimony thus far there's no reason to believe that Mr. DeCosta violated any of the court instructions nor [to] believe that Mr. DeCosta did any improper research." *Id.* at 69.

In view of the above, it is apparent that the Court "gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Arizona,* 434 U.S. at 515–16, 98 S.Ct. at 835. As the record demonstrates, the Court listened to the parties at length prior to declaring a mistrial and excusing the jury. The courtroom questioning of librarian Butson and subsequent argument by counsel lasted one hour and forty minutes. The present case is therefore markedly different from those where the declaration of a mistrial constituted an abuse of discretion because the trial judge did not give the parties an opportunity to speak or present argument on the propriety of a mistrial. *See, e.g., Jorn,* 400 U.S. at 487, 91 S.Ct. at 558; *Lovinger v. Circuit Court,* 845 F.2d 739, 744 (7th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 136, 102 L.Ed.2d 108 (1988); *United States v. Sanders,* 591 F.2d 1293, 1298 (9th Cir.1979). In that the trial judge in the present case heard from the parties prior to declaring a mistrial, the first *Bates* factor supports the government's contention that the trial judge exercised sound discretion.

### B. *Considering the Alternatives*

■ Before declaring a mistrial over defense objections, a trial court should consider and evaluate the alternatives to a mistrial. *Bates,* 917 F.2d at 396.

The principal alternative offered by defense counsel was that the Court ignore that DeCosta had conducted independent research and permit the deliberations to proceed. The Court found this was not a feasible alternative. The testimony of law librarian Butson had established that a juror had violated his oath and disregarded the Court's instructions. The juror had checked out a treatise on the Constitution and was also in possession of a legal pamphlet that contained a highlighted passage. The Court determined that the entire jury had been exposed to the results of DeCosta's research. In light of the Court's overriding obligation to ensure the fairness of judicial proceedings, it would have been inappropriate to turn a blind eye to a juror's efforts to usurp the judge's role as arbiter of the applicable legal standards.

The Court considered whether the parties should be given additional time to brief the issues prior to reaching a decision on whether to declare a mistrial. As it was, counsel had from 11:50 a.m. to 2:30 p.m. to consider whether DeCosta's disregard for the Court's instructions required the declaration of a mistrial. During that time, defense counsel questioned law librarian Butson and had opportunity to formulate their positions on the issue. When asked to state their positions in the proceedings that followed the break, counsel made no representations that more time was needed. Similarly, the Court con-

cluded that continuing the proceedings would not have served any useful purpose because no amount of delay could have changed the fact that a juror had contaminated the rest of the jury by introducing the results of his research into the jury deliberations. Further delay in deciding whether to declare a mistrial was not warranted.

As indicated by the record, the Court also considered whether an alternate juror might be substituted for DeCosta. The Court determined that this possibility was foreclosed by Ninth Circuit case law holding that an alternate may not be substituted for a regular juror, over defense objections, once the jury has commenced deliberations. *See, e.g., United States v. Lamb,* 529 F.2d 1153, 1156 (9th Cir.1975). Although substitution of an alternate is permissible if the parties have stipulated to such a procedure, *United States v. Foster,* 711 F.2d 871, 885–86 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984), no stipulation was entered into in the present case.

As an alternative to its suggestion that the Court permit deliberations to proceed despite DeCosta's legal research, defense counsel also proposed that the Court offer a curative instruction which would provide the jury with the text of the Fourth Amendment. This proposal was unacceptable for a variety of reasons. First, as the Court pointed out to counsel, DeCosta's research was not limited to ascertaining the contents of the Fourth Amendment. Rather, he checked out an entire treatise on the Constitution that contained extensive analysis and commentary. The evidence also indicated that DeCosta's research efforts extended beyond the Constitution, as at the time he talked with law librarian Butson, he had a highlighted legal pamphlet. Second, providing the jury with a copy of the Fourth Amendment was not an appropriate solution because the text of the Amendment, given the charges before the jury, was very likely to foster jury confusion.

The Court also identified removal of DeCosta as a potential option. Initially, it must be noted that this action could only have been taken over the strenuous objections of both defense counsel. More significantly, however, removal of DeCosta would not have addressed the problem of jury contamination. By the time the Court declared a mistrial, it had become clear that the jury had been exposed to DeCosta's research. A jury question forwarded to the Court by the jury foreperson contained the same misappellation for the Fourth Amendment that DeCosta had employed one day earlier in the library. It was therefore evident that DeCosta had infected the jury deliberations with the results of his research.

Nor was the removal of DeCosta combined with a judicial investigation into the extent of jury tampering a viable alternative. It would have been extremely problematic for the Court to have questioned members of the jury. By this time, the Court had been made aware that one of the jurors had posed a question regarding the prevalence of and penalties associated with the crime of jury tampering. Judicial questioning involving two areas of concern might cast a presiding federal judge in the light of exercising an investigative or prosecutorial function inherently inconsistent with the Court's obligation to remain impartial.

■ Moreover, in *United States v. Vasquez,* 597 F.2d 192 (9th Cir.1979), the Ninth Circuit approved of the trial judge's decision to hold a hearing following the possible exposure of the jury to extrinsic information, but cautioned that such hearings should be limited to ascertaining the extent, if any, that jurors saw or discussed the information. *Id.* at 194. In this case, such an inquiry could be viewed as unnecessary because the jury question referencing "Bill of Rights (Article IV)" had established that the jury had been exposed to DeCosta's research. The only questions that remained to be answered concerned the subjective effect of this information upon the jurors. As the Ninth Circuit counseled in *Vasquez,* however, a trial judge should not investigate the subjective effects of extrinsic information upon the jurors. *Id.* Accordingly, the Court determined that a reasonable possibility of actual harm existed and was barred from conducting an inquiry into the subjective effect of the extrinsic information.

Finally, an additional obstacle to jury inquiry was present because, as defense coun-

sel pointed out, the very act of questioning the jury threatened to introduce additional taint or prejudice into the proceedings. *United States v. Sababu*, 891 F.2d 1308, 1334 (7th Cir.1989); *United States v. Williams*, 822 F.2d 1174, 1189 (D.C.Cir.1987).

The Court therefore considered the available alternatives and properly concluded that no less drastic alternatives adequately addressed the situation. Accordingly, the second *Bates* factor also supports the government's contention that the trial court exercised sound discretion in declaring a mistrial.

### C. *Deliberate Instead of Abrupt Action*

When a trial court acts deliberately, rather than abruptly, in declaring a mistrial, it becomes more likely that the court exercised sound discretion. *Bates*, 917 F.2d at 396. In the present case, a deliberate decision is evidenced by the trial court's willingness to hear from the parties and its careful consideration of the alternatives to a mistrial. *Id.* at 397 n. 11. Moreover, the deliberate nature of the action taken in the case is demonstrated by the considerable amount of time devoted to the decision. Shortly after 10:00 a.m. on Tuesday, October 31, 1995—the third day of jury deliberations—the Court learned that juror DeCosta had performed independent legal research. The Court immediately began to assess the implications. At 11:37 a.m., counsel were informed of the situation. During a recess, counsel were given an opportunity to consider how they would like to proceed. At the same time, the Court evaluated the situation and the available options.

Court was reconvened at 2:10 p.m. Aside from the minimal amount of time it took to place law librarian Butson's testimony on the record, the remainder of the afternoon's session was devoted to assessing the propriety of declaring a mistrial. The Court provided the parties with several opportunities to state and explain their positions on the issue. In view of the importance of the decision, coun-

sel were permitted to present extensive argument to the Court. Indeed, by the time the Court adjourned the proceedings, it was 4:12 p.m. Up until the time the decision was rendered, none of the parties suggested that additional time would be helpful to them in arriving at a position regarding mistrial.[4] The Court held that no purpose would be served by delaying its decision.

Consequently, the Court finds that the decision to declare a mistrial was reached deliberately, and not abruptly. The third *Bates* factor therefore bolsters the government's position that the trial court's decision involved a sound exercise of judicial discretion.

### D. *Benefit to the Defendant*

 A mistrial granted to the benefit of the defendant is favored. *Bates*, 917 F.2d at 397. As benefit to the defendant is a factor utilized to determine whether the declaration of a mistrial over the defendants' objection bars retrial, the defense position with regard to a mistrial does not establish that the mistrial was adverse to the defendants' interests.

In the present case, a juror had conducted independent legal research and then infected the jury deliberations by sharing his legal opinions with the other members of the jury. Many concerns are raised by such a situation, but preeminent among them is that the fairness and the integrity of the jury deliberations will be compromised. The legal system entrusts the judge with the responsibility for setting out the relevant law. When a juror attempts to substitute his own legal opinions for the legal scholarship of the judge, the Court must confront the distinct and unacceptable possibility that the juror's misguided efforts to interpret the law for himself and the other jurors will prejudice the defendants' right to a fair trial. Under these circumstances, declaration of a mistrial was necessary to safeguard the defendants' right to a fair trial governed by the applicable law. The mistrial thus benefitted the

---

4. Although defense counsel Aluli now contends that he was required to plead with the Court for additional time, the record clearly reveals that his pleas came only after the Court had announced its decision. Prior to the this time, both defense counsel stated unequivocally that the jury deliberations must be permitted to proceed with juror DeCosta and that they would consider any other course of action objectionable.

defendants by protecting the integrity of the jury deliberations.

The fourth *Bates* factor thus supports the government argument that the declaration of a mistrial was a permissible exercise of the Court's discretion.

### E. *Conclusion—Defendants' Motion to Dismiss the Indictment on Double Jeopardy Grounds*

The Court evaluation of the four factors identified by the Ninth Circuit in *Bates* results in the existence of manifest necessity for declaration of a mistrial. First, the trial court heard the opinions of the parties with regard to the propriety of declaring a mistrial. Second, the trial court considered alternatives to granting a mistrial. Third, the trial court acted deliberately and not abruptly. Fourth, the trial court properly determined that the defendant would benefit from a mistrial. It is therefore apparent that the trial court's decision to declare a mistrial was a proper exercise of its discretion. Accordingly, even if the juror misconduct was not certain to result in reversal, the Defendant's Joint Motion to Dismiss the Indictment on Double Jeopardy Grounds must be denied.

### II. *Motion for Reconsideration of Denial of the Joint Motion to Compel Discovery of All Jury Tampering Information and Denial of Defendant Kanahele's Motion to Conduct Ex Parte Post–Trial Juror Interviews*

After the Court declared a mistrial on Tuesday, October 31, 1995, defense counsel Aluli requested that he be permitted to interview the jurors without regard to the Hawaii Rules of Professional Conduct, which prohibit attorneys from conducting post-trial *ex parte* juror interviews. In light of the allegations of jury tampering, however, the Court was unwilling at that time to consider any action that could affect investigation of the questions raised. Accordingly, the Court ordered a ten-day period during which only law enforcement personnel could contact the jurors for purposes of investigation. Thereafter, the parties could make a motion to be allowed to conduct juror interviews.

On December 5, 1995, defendants made a joint motion to unseal the transcript of the statement that was given to the Court by the deputy United States Marshal on October 31, 1995. As previously indicated, the Court questioned the deputy United States Marshal after learning that a juror in the *Kanahele* case had posed questions regarding the crime of jury tampering. The joint defense motion also requested that the Court compel discovery of all information possessed by the Federal Bureau of Investigation relating to the jury tampering investigation. On December 11, 1995, defendant Kanahele filed another motion in which he requested that the Court relieve him of Rules 3.5(b) and 8.4(a) of the Hawaii Rules of Professional Conduct and that he be permitted to conduct post-trial *ex parte* juror interviews.

In a hearing held on December 26, 1995, the Court granted the defendants' joint motion to unseal the transcript of the deputy United States Marshal's statement. The Court denied the defendants' motion to compel discovery of all information possessed by the Federal Bureau of Investigation relative to the jury tampering investigation and the motion to relieve counsel of Rules 3.5(b) and 8.4(a) of the Hawaii Rules of Professional Conduct, which prohibit post-trial *ex parte* juror interviews.

On December 27, 1995, defendant Kanahele filed a motion requesting that the Court reconsider whether to compel discovery of all information possessed by the Federal Bureau of Investigation relating to the allegation of jury tampering and to reconsider the Court's denial of the defense request to permit *ex parte* post-trial juror interviews.

Defendant Kanahele's motion for reconsideration suggests that the information sought in the defendants' joint motions is needed because it is relevant to the Motion to Dismiss the Indictment on double jeopardy grounds. Defense counsel is mistaken. The propriety of a trial court's mistrial declaration must be assessed using the record that existed at the time of the mistrial. *Bates,* 917 F.2d at 395; *United States v. Allen,* 984 F.2d 940, 942 (8th Cir.1993). None of the information sought by the defense motions was part of the record as it existed on Octo-

ber 31, 1995, the date of the mistrial. As a result, none of the information requested is relevant to the defendants' motion to dismiss the indictment on double jeopardy grounds.

Hawaii Rules of Professional Conduct 3.5(b) and 8.4(a) prohibit post-trial *ex parte* communications between attorneys and jurors. The jury in this case has already been subjected to intense media attention and an investigation conducted by the Federal Bureau of Investigation. In the present case, the concern over the burden on the jury is all the more significant because, for a retrial, this Court must select another jury. The difficulty of this task would be heightened if the Court were to increase the burden of jury service in this case by subjecting jurors to further post-trial attention in the form of *ex parte* jury interviews.

 Federal courts disfavor post-trial inquisition of jurors "lest it operate to intimidate, beset and harass them." *Sixberry v. Buster*, 88 F.R.D. 561, 561–62 (E.D.Pa.1980) (quoting *Stein v. New York*, 346 U.S. 156, 178, 73 S.Ct. 1077, 1089–90, 97 L.Ed. 1522 (1953)). Jurors have an interest in privacy and the public has an interest in well-administered justice; both interests are potentially compromised by post-trial juror interviews. *Haeberle v. Texas Int'l Airlines*, 739 F.2d 1019, 1022 (5th Cir.1984).

 The defense argues that considerations of fairness require that they be permitted to interview the jurors. In support of their position, the defense notes that representatives of the Federal Bureau of Investigation have been permitted to contact the jurors in order to investigate the allegations of jury tampering. The defense therefore suggests that, despite the lack of relevance to their Double Jeopardy Motion, it would be fundamentally unfair to permit government representatives to contact the jurors while denying the defense the same opportunity. What the defense fails to appreciate is that conducting investigations into illegal activity is an appropriate function of the executive branch. Throughout these proceedings, defense counsel have consistently taken the position that their clients are victims of government persecution, but have produced no evidence to back up their allegations. In the

hearing on December 29, 1995, defense counsel Aluli made an allegation of possible "prosecutorial team misconduct" based on the interchange between the deputy marshal and the juror. Transcript of Hearing, December 29, 1995, at 5. This matter has been investigated by the Federal Bureau of Investigation. Nothing has been brought to this Court's attention by anyone that suggests wrongdoing by any government employee or entity. Nothing said by the deputy marshal who was spoken to by the juror about jury tampering or anything else that has come to this Court's attention warrants the Court stepping outside of its judicial role to undertake an investigation of juror conduct or to permit the defense to do so.

Accordingly, the defendant's motion for reconsideration is hereby denied.

### III. *Motion to Recuse*

 At the December 29, 1995 hearing, defense counsel Aluli made an oral motion requesting that the Court recuse itself. Reasons suggested by defense counsel were that the Court was too close to the factual issues and there might be an appearance of conflict. Transcript of Hearing, December 29, 1995, at 19. Earlier in the initial pre-trial proceedings, defense counsel Aluli filed another motion, which sought the recusal of Magistrate Judge Kurren. In an order dated August 21, 1995, the Court denied that motion to recuse. Defendant had argued that there was a "conflict of interest" stemming from the magistrate judge's receipt on June 22, 1995, together with certain other federal judges and officials in the District of Hawaii, of a "Notice of Apartheid, War Crimes and War Crimes Against Humanity." The Notice accused its recipients of having "full knowledge and participation in the direct murder and extermination of the Kanaka Maoli People and their Government" and admonished that "you shall be sought out, arrested and imprisoned, to be brought before an international Criminal Tribunal to answer for your participation in crimes of Apartheid and Genocide." The notice concluded with the statements, "There will be no appeal. Judgment will be final." It was signed by the purported Attorney General of the "Nation

of Hawaii." The Court found no merit in the motion for recusal of Judge Kurren and finds none here.

As with defendant Kanahele's earlier motion for recusal of Judge Kurren, the present motion must be considered under 28 U.S.C. § 455(a).[5] Under 28 U.S.C. § 455(a), "[a]ny justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Subsection (b)(1) further provides that recusal is required where a federal judge "has a personal bias or prejudice concerning a party, or a personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).

The basis for defendants' motion to recuse is not clear. The defendants' motion to recuse may be based upon either their belief that this Court harbors some personal bias or prejudice against them or upon their representation that the impartiality of this Court might reasonably be questioned. These bases for the motion to recuse are suggested by some of defense counsel Aluli's remarks during the December 29, 1995 hearing. For instance, during that hearing, Aluli stated, "it all ties in with all your motions and denials of my motions that really has the appearance of you being very partial." Transcript of Hearing, December 29, 1995, at 27.

As the Court stated at the December 29, 1995 hearing, the Court has no personal bias or prejudice against the defendants. Nor does the Court consider this to be a case in which its impartiality might be reasonably questioned. It is well-settled that adverse rulings do not constitute the requisite bias necessary to justify recusal. *Hagans v. Andrus*, 651 F.2d 622, 628 (9th Cir.), *cert. denied*, 454 U.S. 859, 102 S.Ct. 313, 70 L.Ed.2d 157 (1981). Nor does the fact that this Court is assessing the propriety of its own mistrial declaration require recusal. *See, e.g., United States v. Rivera*, 802 F.2d 593 (2d Cir.1986).

During the hearing, defendant Kanahele directly addressed the Court and, employing an argument reminiscent of that used in his previous recusal motion, suggested the Court should recuse itself because of the presumed prejudicial effect of papers filed on his behalf by third parties. Kanahele complained that in the month prior to the hearing, documents had been filed in this case by third parties. Kanahele expressed concerns that the information contained in these filings might prejudice the Court against him. This argument is unavailing for a number of reasons. First, as the Court explained to Kanahele, defense counsel are permitted to file a motion to have objectionable documents removed from the record, thereby eliminating the possibility of prejudice. Second, as the Court also made clear, given that the filings referred to by Kanahele were submitted by nonparties, they were not read by the Court. As a result, there was no danger of prejudice. Third, even if these documents had been viewed by the Court, nothing a judge learns from presiding over the case before her may be used as a basis for disqualification. *King v. United States*, 576 F.2d 432 (2d Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 155, 58 L.Ed.2d 154 (1978).

To the extent that the defense motion for recusal reflects a belief that the trial judge might have to be called as a material witness in the proceeding, the motion is meritless. The Court ensured that all facts relevant to this case be placed on the record. The Court questioned law librarian Butson on the record and in open court regarding the incidents that transpired in the law library on Monday morning, October 30, 1995. With regard to juror DeCosta's questions to the deputy marshal regarding jury tampering, the Court made certain that the entirety of the Court's communication with the deputy marshal was on the record. As a result, the Court has no knowledge of any facts relevant to this case outside those that appear in the record.

---

**5.** Additional provisions governing the recusal of federal judges are set forth in 28 U.S.C. § 144. "Although the substantive test for bias and prejudice is identical in sections 144 and 455, the procedural requirements of the two sections are different." *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir.1980). As defendant has not met section 144's stricter procedural requirements, including the filing of an affidavit specifically alleging facts stating the grounds for recusal under section 144, the Court limits its inquiry to defendant's section 455 claims.

■ An allegation that a district judge may be a material witness does not automatically require disqualification. *United States v. Rivera*, 802 F.2d 593, 601 (2d Cir.1986). Rather, the trial judge may elect to hold a hearing on the motion or, if insufficient facts have been alleged to warrant a hearing, may simply decline to recuse herself. *Id.* In the present case, defendants have not alleged sufficient facts to warrant a further hearing on the recusal motion.

The Court finds that there are no grounds justifying recusal in the present case. Accordingly, the Court hereby denies the defendants' motion to recuse.

## CONCLUSION

The Court rules as follows:

Defendants' Joint Motion to Dismiss the Indictment on Double Jeopardy Grounds is DENIED.

Defendant Kanahele's Motion to Reconsider the Court's denial of the Joint Motion to compel discovery of all information in the government's possession relating to the allegation of jury tampering and the Court's denial of defendant Kanahele's request to allow the defense to conduct *ex parte* post-trial juror interviews is DENIED.

Defendants' Motion for Recusal is DENIED.

IT IS SO ORDERED.